IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

## STATE OF TENNESSEE v. MICHAEL CHRISTOPHER ADAMS AND JERRY HOLT, JR.

**Direct Appeal from the Criminal Court for Sullivan County
Nos. 540,318 and 540,320       Richard R. Vance, Judge**

**No. E1999-00446-CCA-R3-CD - Decided July 11, 2000**

The defendants, Michael Christopher Adams and Jerry Holt, Jr., appeal their convictions by a Sullivan County jury. Adams was convicted of second degree murder and four counts of aggravated assault. He received a total sentence of forty-nine years. Holt was convicted of four counts of aggravated assault and received a total sentence of twenty years. Both defendants challenge the sufficiency of the evidence and the trial court's imposition of consecutive sentencing. Adams also challenges the trial court's application of enhancement factors and failure to apply mitigating factors. We hold that the evidence is sufficient, but we hold that the trial court erred in sentencing. Adams's sentence is modified to reflect a total sentence of forty years, and Holt's sentence is modified to reflect a total sentence of twelve years.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in part; Modified in part**

TIPTON, J., delivered the opinion of the court, in which WOODALL, J., and GLENN, J., joined.

Frank L. Slaughter and Frank L. Slaughter, Jr., Bristol, Tennessee, for the appellant, Michael Christopher Adams.

Stephen M. Wallace, District Public Defender, Blountville, Tennessee, for the appellant, Jerry Holt, Jr.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General, and Joseph Eugene Perrin, Assistant District Attorney, for the appellee, State of Tennessee.

### OPINION

The defendants, Michael Christopher Adams and Jerry Holt, Jr., appeal as of right from their convictions by a jury in the Sullivan County Criminal Court. Adams was convicted of second degree murder, a Class A felony, and four counts of aggravated assault, a Class C felony. He was sentenced as a Range I, standard offender to twenty-five years for the murder conviction and six

years for each aggravated assault conviction, to be served consecutively in the Department of Correction. Holt was convicted of four counts of aggravated assault, a Class C felony. He was sentenced as a Range I, standard offender to five years for each conviction, to be served consecutively in the Department of Correction. On appeal, both defendants challenge the sufficiency of the evidence. Adams further contends that the trial court erred in sentencing by applying certain enhancement factors, denying mitigating factors, and imposing consecutive sentences. Holt contends that the trial court erred by imposing consecutive sentences. We affirm the convictions but modify the sentences to reflect a total sentence of forty years for Adams and twelve years for Holt.

At trial, Sullivan County Sheriff's Deputy Jeff Tabor testified that he was working in the patrol division on May 31, 1997. He was dispatched at 2:30 or 3:00 a.m. on the report of shots fired on Hobbs Hollow Road. Near the scene, he met with Sergeant Taylor, who was accompanied by the four aggravated assault victims: Mary Commerton, Chris Commerton, Melissa Commerton, and Scott Berry. The officers placed the victims in their patrol cars and drove up a steep gravel driveway leading to a trailer. Deputy Tabor testified that a street light illuminated the trailer and that it could be seen clearly. About fifty to seventy-five feet from the trailer, the officers found Mary Commerton's station wagon. Travis Freese, the murder victim, was lying in the passenger's seat of the vehicle, and his face was bloody from a wound to the lower left eye. As the officers were awaiting assistance, a car containing Kim Arnold, Billy Thrift and Jonathan Arnold drove down the driveway. The occupants, who had been in the trailer, were ordered out of the car. Sergeant Taylor then ordered the remaining occupants out of the trailer, and Amanda Hurt, Mike Arnold, and Holt left the trailer. Officers had to remove Adams from the trailer. Deputy Tabor testified that Adams may have been wearing a shirt but that Holt was not.

Mary Commerton testified that on the evening of May 31, she and her husband went to Kingsport while her son, Chris, and daughter, Melissa, stayed at home. Chris and Melissa were eighteen and sixteen, respectively, at the time of trial. Travis Freese and Scott Berry, friends of Chris, were also at the house. Mrs. Commerton and her husband returned home at 11:30 p.m. She testified that the telephone rang several times and that when she answered it, the person on the line threatened to kill Mr. Freese, her, and her family. She said that she hung up but that the telephone continued to ring. She said that the kids decided to hitchhike to the home of the person making the calls. She said that rather than have them hitchhike, she decided to drive them. She said that she also wanted to talk to the caller.

Mrs. Commerton said that she drove and that Mr. Freese sat in the passenger seat and gave directions. Chris sat behind Mr. Freese, Melissa sat in the middle, and Mr. Berry sat behind the driver's seat. She said they turned onto a dead-end gravel road leading up a hill. She said she could see a trailer with a porch light on at the top of the hill. Mrs. Commerton testified that as she drove up the hill, she saw a tall, thin man with a pony tail and no shirt, standing on the porch. She identified the man as Holt. She said that the next thing she knew, Holt had a gun. Mrs. Commerton said that she started to back up and that Mr. Freese was leaning out the window cursing at Holt. She said that after she pulled Mr. Freese into the car, he was shot. She said that gunshots continued and that the kids got out of the car and ran. She tried unsuccessfully to revive Mr. Freese before she got out of the car and ran during the shooting. Mrs. Commerton testified that her car was struck and

began to pour smoke. She said that at least eight or nine shots were fired. She said she saw another man on the porch, whom she identified as Adams, but she could not be sure that he had a gun. She admitted that she did not get a good look at the people on the porch. She testified that she had no weapons, alcohol, or marijuana in her vehicle.

Mrs. Commerton testified that she saw no signs that Mr. Freese had been drinking or smoking marijuana. She said that she did not know who put a bottle of St. Ides malt liquor and a lead pipe in the hatch of her vehicle. She said she thought that Mr. Freese's dispute was with Mike Arnold.

Chris Commerton testified that during the evening on May 31, Mr. Freese was paged several times and that the telephone would ring every few minutes at the Commerton home. Mr. Commerton said that when he answered one of the calls, the caller cursed and threatened him. He gave the telephone to Mr. Freese, who had a heated conversation with the caller. Mr. Commerton said that the telephone continued to ring and that Mr. Freese would talk to the caller. He said that they later decided to go to Mike Arnold's trailer to confront the people at the trailer regarding the telephone calls. He said that no one in the station wagon had any weapons.

Mr. Commerton said that when they drove up the driveway, the trailer's porch light was on, and Holt was sitting on the porch. He said that Holt had a shotgun and began waiving his arms and threatening them. He said that Holt walked into the trailer for a few seconds and then returned to the porch, followed by Adams. He said that Holt raised his shotgun at the car and began firing. Mr. Commerton said that his mother put the car in reverse and started to back away when a bullet hit the car and smoke poured out. He said that Mr. Freese's head was out the window and that he was calling for Mike Arnold and telling the defendants to put down their guns. Mr. Commerton said that after the bullet hit the car, everyone in the backseat got out and ran. He said that eight or nine shots were fired and that one bullet came through the windshield and hit Mr. Freese. He said that about three shots were fired as he was running toward the woods. He said that the shots were fired a few seconds apart and sometimes sounded as if they came from different directions.

Mr. Commerton admitted that he, Mr. Freese, and Mr. Berry smoked marijuana at his house that night. He said that he was not aware of anyone drinking beer and that he did not know whose malt liquor bottle was in the hatch of the station wagon. He said that he never saw Adams fire a gun.

Scott Berry testified that after Mr. Freese answered his pager, the telephone began ringing incessantly at the Commerton home. He said that no one brought weapons on their trip to the trailer. He said that as they rode up the driveway, he could see the trailer with the porch light on. He said he saw someone standing on the porch with a shotgun, who raised his hands in the air and began shooting. Mrs. Commerton tried to back up, and Mr. Freese was yelling out the window asking for Mike Arnold. Mr. Berry testified that he ducked once he heard gunshots. He said that the shots kept coming and that the car was hit a few times and began to pour smoke. He estimated that eleven or twelve shots were fired, with three to four seconds between each shot. He said that he could not see the shooters because of the smoke coming from the radiator. He said that he ran to the woods and continued to hear shots as he was running.

Mr. Berry testified that he drank St. Ides malt liquor that night and believed that Mr. Freese and Mr. Commerton drank as well. He said he did not remember anyone smoking marijuana. He said that he initially thought that the person holding the gun on the porch was Mike Arnold.

Melissa Commerton testified that when the group came up the driveway, she saw a man with a gun standing on the porch and yelling. She said her mother began to back up. She said the man on the porch went inside the trailer and came out with another man, and the two began shooting. She said that a bullet hit the car and it began to pour smoke. She, Chris, and Mr. Berry ran down the driveway. She said she saw that Mr. Freese was dead when she left the car. She said that about eight shots were fired and that the shots continued as they ran down the driveway. She said she could not see who fired the shots because she ducked through part of the shooting and because of the smoke coming from the vehicle. Ms. Commerton said that she was not aware of anyone drinking or smoking marijuana that night. She said she told police that Mr. Freese and Mr. Berry stated that Mike Arnold was making the calls.

Amanda Hurt testified that Kim Arnold took her to the trailer that evening. She said that Billy Thrift, Ms. Arnold's boyfriend, lived in the trailer with Adams. Mike Arnold and Kevin Arnold, Ms. Hurt's boyfriend at the time, were also at the trailer that night. Ms. Hurt testified that she had gone to school with and previously dated Mr. Freese and that Holt and Mr. Freese got along well. She said that she did not believe that Mr. Freese had met Adams. She said that Mr. Freese and Mike Arnold did not get along and that Mr. Freese wanted to fight him because he had called Mr. Freese a "bitch."

Ms. Hurt testified that Kim Arnold, Mr. Thrift, and Adams left the trailer at 9:00 p.m. and came back at around midnight with two shotguns and shells. She said that the night before, a group of people had come to the trailer and had broken the taillights on the cars and tried to burn down the trailer using a glass bottle containing gasoline and a fuse. She said that around 1:30 a.m. on the 31st, Mike Arnold answered the telephone, and the caller claimed that he knew about the events of the preceding evening. She said that at various times, Mike Arnold, Kevin Arnold and Adams were on the telephone cursing the caller. She said that she thought Adams was on the telephone when he went outside as Mr. Thrift and Holt fired the shotguns into the air so that the caller could hear. She said that Adams told the caller that if he came to the trailer, "you'll get this." She said that one of the men stated that a woman got on the telephone and said they would be there in fifteen minutes.

Ms. Hurt testified that everyone was drinking that night except for her and that they continued to drink beer and discuss who they would fight. She said that they eventually decided that no one was coming, but then the men saw headlights coming up the driveway, and Kevin Arnold stated, "They're here." Ms. Hurt said that she stood in the doorway. She said that Mr. Thrift and Holt each grabbed a shotgun and shot once in the air. She said that someone from the car yelled, "Tell Mike to get out here." She said that Adams then came outside, took a gun, and ran down the driveway, shooting toward the car. She said she did not know if Adams took the shotgun from Holt or Mr. Thrift. She estimated that Adams fired three or four shots at the car. She said that when he came back to the trailer, he stated that he had hit the car and that he thought he had hit someone but did not know for sure. She said that Adams then went to the bedroom and passed out. She said that

-4-

Kim Arnold, Mr. Thrift, Mike Arnold, Kevin Arnold, and Holt ran toward the landlady's house. She said that when they came back, they got in the car and tried to leave but that the police stopped them. Ms. Hurt testified that when she arrived at the trailer, she saw the glass bottle containing gasoline sitting upright in front of the porch. She said that nobody seemed concerned that it was sitting there. She said that everyone in the trailer knew that Mr. Freese was not one of the men involved in the events of the previous night.

Ms. Hurt testified that Adams was drunk that night. She said that at one point, he was lying on the floor and would not get up but that he was not unconscious. She said Adams was not wearing a shirt but Holt was. She said Holt never fired at the car and never shot toward Mr. Freese. She said nobody shot after Adams began shooting.

Sally Allen testified that she works in the Sporting Goods department of the Bristol Wal-Mart. She testified that she sold Adams two .12 gauge shotguns and six cartons of shells on the night of May 31. She said that Adams filled out the top portion of a required federal form and that she filled out the bottom portion. Adams showed the required identification, and she checked the paperwork. Her supervisor, Herb Frederickson, checked the paperwork, and they both signed the federal form. Ms. Allen said that she interacted with Adams for about ten minutes. She said that he was not intoxicated and that she saw no indications that he had been drinking.

Herb Frederickson, an assistant manager at Wal-Mart, testified that he checked the paperwork, verified the information, and signed the federal form. He said that he would not have sold Adams the guns if Adams had appeared intoxicated.

Sullivan County Sheriff's Department Lieutenant Harry Noel testified that he is a supervisor in the criminal investigation division. He testified that he arrived at the scene around 3:30 a.m. and began to process the evidence. He said that a security light was on outside the trailer. He said that he found shotgun holes and projectiles in the Commerton vehicle and removed one slug from the engine block. He said that slugs struck the hood, windshield, and a tire. On the porch, he found a St. Ides bottle containing a cloth-type wick and a liquid smelling like gasoline. He found numerous spent shells around the porch area. He found the two .12 gauge shotguns and a .22 caliber pistol wrapped in a blanket in a storage building behind the trailer. A metal pipe and a St. Ides bottle were found in the hatch of the Commerton vehicle.

Dr. William McCormick, Deputy Chief Medical Examiner for Tennessee, testified that he performed the autopsy on Mr. Freese. Mr. Freese suffered an entrance gunshot wound to the left side of his face, adjacent to the left side of the nose. The bullet went through the skull, cut the brain stem

in two, and lodged in the right side of the bone at the base of the skull. Mr. Freese's blood alcohol content was .13 percent, and he tested positive for moderate, active marijuana use.

Detective Joe Miller of the Sullivan County Sheriff's Department testified that he assisted Lieutenant Noel in processing the scene. He said that he found three boxes of ammunition in the kitchen cabinet and the remainder lying around the sink. He said that three boxes were empty and

that only five to eight unfired shells remained.

Tommy Heflin, a forensic scientist with the Tennessee Bureau of Investigation firearms identification section, testified that a .12 gauge, single-shot shotgun will fire only one shot at a time. The shooter must load a shell into the chamber, close the weapon, and cock the hammer to shoot. The shooter must remove the fired shell casing and repeat the procedure to fire another shot. Agent Heflin received eleven fired .12 gauge shell casings. He said that they were lead slugs typically used for deer hunting. He determined that six of the shell casings came from one of the shotguns and four came from the other. One of the shells could not be traced to either shotgun because it did not have enough markings. The slugs from the engine, tire, and Mr. Freese could not be tested because they were too damaged. Agent Heflin testified that if a person fired a shotgun in a wooded rural area, the sound would possibly be loud enough to generate an echo, which one might confuse with a second shot. He said he could not determine when the shells were fired. Upon the foregoing evidence, the jury convicted Adams of second degree murder and four counts of aggravated assault and convicted Holt of four counts of aggravated assault.

## I. SUFFICIENCY OF THE EVIDENCE

Both defendants contend that the evidence is insufficient to support their convictions. Adams argues that Ms. Hurt's testimony shows that he was too drunk to have run toward and shot at the victims' vehicle, as Ms. Hurt claimed. Holt argues that the jury's convicting Adams for the murder shows that the jury believed that Adams was the shooter and that Holt did not fire a gun at the Commerton vehicle. He argues that all of the eyewitnesses testified that only one person shot at the car and that the jury's finding that Adams fired the shot that killed Mr. Freese shows that Holt did not shoot at the car.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

A conviction for second degree murder requires proof that the defendant knowingly killed another. Tenn. Code Ann. § 39-13-210(a)(1).

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Tenn. Code Ann. § 39-11-302(b). An assault, as charged in the indictment, occurs when one

"[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury[.]" Tenn. Code Ann. § 39-13-101(a)(2). An assault becomes aggravated when one uses or displays a deadly weapon. Tenn. Code Ann. § 39-13-102(a).

Adams claims that the evidence is insufficient to support his convictions for second degree murder and aggravated assault because the testimony of Ms. Hurt is contradictory and shows that he was too intoxicated to have run to the victims' car while shooting, as Ms. Hurt claimed. Ms. Hurt testified that she was standing in the doorway of the trailer when the shootings occurred. She testified that when the victims drove up the driveway, Adams grabbed a gun and ran down the driveway, shooting at the Commerton vehicle. She testified that Adams then returned to the trailer and stated that he had hit the car and that he thought he had hit someone. The jury obviously accredited Ms. Hurt's testimony, as is their prerogative. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Although Ms. Hurt testified that the defendant had been drinking that night and, at one point, would not get off the floor, she also testified that the defendant was not unconscious. The jury was instructed on the defense of voluntary intoxication but rejected it. The jury was free to accept portions of Ms. Hurt's testimony and reject others. State v. Bolin, 922 S.W.2d 870, 875 (Tenn. 1996). We hold that the evidence is sufficient to support the convictions.

Holt contends that the evidence is insufficient to support his aggravated assault convictions. He argues that the jury's finding him not guilty of murder shows that it found that he did not fire a gun at the Commerton vehicle. We disagree. The jury obviously determined, based upon Ms. Hurt's testimony, that Adams fired the fatal shot that hit Mr. Freese. However, the jury also heard testimony from Mary Commerton that Holt was standing on the porch with a gun and that shots were fired at the vehicle while she was in it and while she and the other occupants left the vehicle and ran into the woods. Chris Commerton testified that Holt was on the porch with a shotgun and was waiving his arms and threatening them when they drove up the driveway. He testified that Holt raised his shotgun and began firing at the car. He testified that the shots continued as they ran into the woods. Furthermore, several witnesses testified that the shots occurred in rapid succession, with only a few seconds in between. Agent Heflin testified that the single-shot shotguns used during the incident required reloading after each use. Chris Commerton testified that the shots sounded as if they came from different directions. Melissa Commerton testified that two men shot at the car. Thus, the jury also heard evidence that two people participated in the shootings, not one. We hold that the evidence is sufficient to support Holt's convictions.

## II. SENTENCING

The defendants contend that the trial court erred in sentencing. Adams argues that the trial court erroneously applied enhancement factors, failed to apply mitigating factors, and erred by imposing consecutive sentences. Holt argues that the trial court erred by imposing consecutive sentences. The state contends that the defendants were properly sentenced.

Appellate review of sentencing is de novo on the record with a presumption that the trial

court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229 (Tenn. 1986).

The sentence to be imposed by the trial court for a Class A felony is presumptively the midpoint in the range when there are no enhancement or mitigating factors present. The presumptive sentence for a Class C felony is the minimum in the range in the absence of mitigating or enhancement factors. Tenn. Code Ann. § 40-35-210(c). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and then reduce the sentence as appropriate for any mitigating factors. Tenn. Code Ann. § 40-35-210(d), (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

### A. Adams's Sentence

A presentence report was introduced into evidence at the sentencing hearing. The report reflects that Adams was twenty years old at sentencing and has convictions from 1997 for two counts

of disorderly conduct, underage possession of alcohol and assault, for which he was on probation at the time of the present offenses. The report reflects that he has a juvenile record from Centerville, Maryland, in 1994 for two counts of felony theft and in 1993 for felony breaking and entering. The report reflects that in October 1993, Adams fell fourteen feet from a tree, causing him to lose consciousness. According to the report, he continues to suffer from intermittent loss of consciousness and seizures as a result. Adams reports fair physical health and poor mental health. He stated that he worked for Billy Thrift at Sunset Roofing before his arrest.

The trial court found the following enhancement factors applicable, as listed in Tenn. Code Ann. § 40-35-114:

> (1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;
> (2) The defendant was a leader in the commission of an offense involving two (2) or more criminal actors;
> (8) The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community; [and]
> (9) The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense[.]

The trial court applied factor (9) only to the second degree murder conviction. The trial court also stated that Adams committed offenses as a juvenile that would have been felonies had they been committed by an adult. Tenn. Code Ann. § 40-35-114(20). However, it stated that this "relates to the enhancing factor of his previous history of criminal convictions." In mitigation, the trial court considered that Adams was under the impression of a threat to his home and that he expressed remorse, but the court gave the factors little weight. Tenn. Code Ann. § 40-35-113(3), (13). The record shows that the trial court considered Adams's previous head injury but found that it did not affect "his ability to think clearly and act . . . ." Tenn. Code Ann. § 40-35-113(13).

First, Adams contends that the trial court erred by applying factor (1). Though admitting his 1997 convictions, he argues that his record is not extensive and that the 1997 convictions were the result of conduct that occurred on his wedding night when another man was flirting with his wife. Adams's argument relates to the weight given to the enhancement factor, an issue which is left to the trial court's discretion. He has not demonstrated error.

Adams also contends that the trial court erred by applying factor (20), that he committed crimes as a juvenile that would have been felonies had they been committed by an adult. He argues that no proof of the juvenile adjudications from Maryland exists in the record and that no proof exists to show that the offenses would have been felonies in Tennessee.

Initially, we note that our review of the record shows that the trial court did not apply factor (20) but rather considered the juvenile offenses when applying factor (1). The trial court stated that Adams's juvenile offenses related to the enhancement factor of his previous history of convictions

and criminal conduct. Thus, the record shows that the trial court considered the juvenile offenses not as a separate enhancement factor under (20) but as part of factor (1). The trial court's consideration of the juvenile offenses under factor (1) was improper. In 1995, the legislature added factor (20) to the existing list of enhancement factors. This court has determined that as a result of the amendment, "factor (20) became the exclusive factor for enhancing a sentence based on a juvenile's record." State v. Brent Brown, No. 02C01-9710-CC-00419, Hardeman County, slip op. at 5-6 (Tenn. Crim. App. Oct. 26, 1998). Thus, a court can only consider juvenile offenses for enhancement purposes under factor (20) and not pursuant to factor (1). Id.

Having determined that the trial court erred by considering Adams's juvenile offenses pursuant to factor (1), we must now determine whether factor (20) applies. Adams contends that no proof exists in the record to support the application of factor (20). He argues that proof of the offenses was not submitted and that no evidence exists to show that the offenses would have been felonies in Tennessee. Initially, we note that the standard of proof required for finding a factual basis for sentencing within a range is the preponderance of the evidence standard. See State v. Carter, 908 S.W.2d 410, 413 (Tenn. Crim. App. 1995).

The presentence report states that the following record was located through the juvenile services office in Centerville, Maryland:

> 1-12-94 - Felony theft (#4712) - On 10-25-94 the defendant was placed on probation and ordered to pay restitution- Queen Anne's County, Maryland Circuit Court (sitting as juvenile court)
> 1-12-94 - Felony Theft (#4722) - Same disposition as listed above.
> 12-5-93 - Felony breaking and entering (#4712) - same disposition as listed above. Records indicate that the defendant did pay all restitution and court costs in full.

The report states that the officer spoke with John Gadsby, a supervisor for the Centerville Office. The trial court made a factual finding that the defendant committed theft and burglary as a juvenile that would have been felonies had they been committed by an adult.

We hold that the trial court was entitled to rely upon evidence of the juvenile offenses contained in the presentence report. This court has consistently held the presentence report to be reliable hearsay. See State v. Baker, 956 S.W.2d 8, 17 (Tenn. Crim. App. 1997) (holding that the information contained in a presentence report "is reliable because it is based upon the presentence officer's research of the records, contact with relevant agencies, and the gathering of information which is required to be included in a presentence report."). Furthermore, this court has held that certified copies of convictions are not necessary to prove a prior criminal history; thus, courts can rely upon the presentence report. See State v. Richardson, 875 S.W.2d 671, 677 (Tenn. Crim. App. 1993). Although Adams did argue at the sentencing hearing against the trial court's consideration of the Maryland offenses, his argument was directed toward the fact that the details of the offenses were not in the record. He did not deny the existence of the offenses. Under these circumstances, we believe that the record supports the existence of the offenses.

The remaining question is whether adequate proof exists in the record to show that the offenses would have been felonies if committed by an adult. The state contends that the plain language of the statute requires proof of felony offenses and that we can rely upon the presentence report's classification of the offenses as felonies in Maryland. Adams contends that the proof must show that the offenses would have been felonies in Tennessee.

Statutes are to be construed to ascertain and give effect to legislative intent. State v. Sliger, 846 S.W.2d 262, 263 (Tenn. 1993). Legislative intent should be gleaned from the "natural and ordinary meaning of the language used, without a forced or subtle construction that would limit or extend the meaning of the language." Carter v. State, 952 S.W.2d 417, 419 (Tenn. 1997). The legislature is presumed to know the existing state of the law when it enacts a statute. Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995). Furthermore, the provisions of the criminal code shall be construed according to the fair import of their terms to promote justice and to effect the objectives of the criminal code. Tenn. Code Ann. § 39-11-104.

Under these circumstances, we hold that proof in the record that Adams committed offenses as a juvenile that would have been felonies in Maryland is sufficient for the application of factor (20). The plain language of the statute requires that a defendant have adjudications for offenses that would have been felonies if committed by an adult. It does not require that the offenses be felonies in Tennessee. We note that for purposes of determining a defendant's sentencing range, the Sentencing Act provides that prior convictions "include convictions under the laws of any other state, government, or country which, if committed in this state, would have constituted an offense cognizable by the laws of this state." See Tenn. Code Ann. § 40-35-106(b)(5), -107(b)(5), -108(b)(5). Thus, the legislature has contemplated that for purposes of determining the sentencing range, convictions from other states must constitute offenses in Tennessee. The Act further provides that if "a felony from a jurisdiction other than Tennessee is not a named felony in this state, the elements of the offense shall be used by the Tennessee court to determine what classification the offense is given." Id. Thus, the legislature has contemplated that trial courts may need to compare the elements of offenses to determine if a felony from another state can be used for range enhancement in Tennessee. Tennessee courts have concluded that when the legislature includes particular language in one section of the statute but omits it in another section of the same act, it is generally presumed that the legislature acted purposefully in the subject included or excluded. See City of Knoxville v. Brown, 260 S.W.2d 264, 268 (Tenn. 1953); State v. Harkins, 811 S.W.2d 79, 82 (Tenn. 1991). Considering the foregoing principles, we believe that had the legislature intended under factor (20) for a trial court to compare elements to determine if a felony from another state would be a felony in Tennessee, it would have so provided in the statute as it did with respect to range enhancement. In the absence of such language, we believe that the trial court properly relied upon the evidence in the presentence report that Adams committed offenses as a juvenile in Maryland that would have been felonies if committed by an adult. Thus, though not specifically found by the trial court, we hold that factor (20) applies.

Next, Adams argues that he could not have been the leader of the offense because he has limited mental capacity due to his head injury and because he was intoxicated on the night of the

offense. To the contrary, the record supports the trial court's finding that although his head injury may have "affected some of his cognitive skills from the standpoint of schooling . . . it does not appear that it in any way affected his ability to think clearly and act on this case." The trial court found that Adams was a leader because he purchased the guns that were used and essentially "armed the camp." The record supports the trial court's finding. Although Adams claims that he was intoxicated when he bought the guns, testimony from the Wal-Mart employees shows that Adams did not appear to be intoxicated and was able to complete the necessary paperwork.

Adams argues that the trial court should not have considered his previous unwillingness to comply with a sentence involving release in the community. The record reflects that the trial court applied this factor because Adams was on probation at the time he committed the present offenses. We hold that the trial court erred by applying the enhancement factor. The commission of the offense for which the defendant is being sentenced does not make factor (8) applicable because there must be a previous history of unwillingness to comply. State v. Hayes, 899 S.W.2d 175, 185-86 (Tenn. Crim. App. 1995).

Adams contends that the trial court erred by failing to apply certain mitigating factors. He argues that the trial court should have considered that he was protecting his home and himself and that his property had been vandalized the night before. Tenn. Code Ann. § 40-35-113(13). However, the record reflects that the trial court gave some consideration to the fact that Adams was "under the impression of a threat from somebody regarding his home." Adams's argument relates to the weight given to the factor by the trial court, a matter within the trial court's discretion. Adams has not shown that the trial court abused its discretion.

Adams contends that the trial court should have considered his youth and inexperience in mitigation. Tenn. Code Ann. § 40-35-113(6). However, the Tennessee Supreme Court has stated that when determining the applicability of factor (6), the court should consider "the defendant's age, education, maturity, experience, mental capacity or development, and any other pertinent circumstance tending to demonstrate the defendant's ability or inability to appreciate the nature of his conduct." State v. Adams, 864 S.W.2d 31, 33 (Tenn. 1993). Nothing in the record suggests that Adams lacked substantial judgment because of his youth. Thus, the trial court properly denied this factor.

Adams further contends that the trial court should have considered his head injury in mitigation. Tenn. Code Ann. § 40-35-113(13). He argues that a doctor's report shows that he believed the total of eight nickels was forty-five cents. However, the record reflects that the trial court acknowledged the head injury but found that it did not affect his ability to think clearly and act on the night of the offense. The record supports the trial court's giving little weight to this mitigating factor.

Adams lists the following additional mitigating factors in his statement of the issues: the defendant was motivated by a desire to provide necessities for himself, namely, his own life; the

defendant committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated his conduct; the defendant has suffered depression and felt remorse following the offenses; he has attended GED classes in jail; he acted under strong provocation; substantial grounds exist tending to excuse or justify his conduct; and he acted under the duress or domination of another person. Adams makes no argument regarding these factors and provides no citation to the record or to relevant authority. Under these circumstances, we view the issues to be waived. See T.R.A.P. 27(a)(7). Nevertheless, we have reviewed the entire record in light of the factors listed and conclude that they are without merit.

Our review of the trial court's application of enhancement and mitigating factors shows that the trial court erred by considering Adams's juvenile offenses as they related to factor (1) but that factor (20) applies. In other words, although factor (1) is entitled to less weight, this is balanced by the application of factor (20). The trial court also erred by applying factor (8) regarding the defendant's previous inability to comply with a sentence involving release. Enhancement factor (2) is entitled to some weight considering the seriousness of Adams's conduct in procuring and using a deadly weapon. Factor (9) applies only to the second degree murder conviction but is of considerable weight. Mitigating factors (3) and (13) apply to all his convictions but are entitled to little weight.

With respect to the second degree murder conviction, considering the enhancement and mitigating factors, and the effective sentence to be received in conjunction with the remaining offenses, see, e.g., State v. Marshall, 888 S.W.2d 786, 788 (Tenn. Crim. App. 1994), we believe that a twenty-four-year sentence is warranted. With respect to the aggravated assault convictions, we begin at the minimum in the range and apply the enhancement and mitigating factors. We believe that four-year sentences for each aggravated assault conviction are justified by the record.

Although more akin to a sufficiency of the evidence argument, Adams contends that he should have received only one sentence for the aggravated assault convictions because they were the result of one act. We disagree. The record demonstrates that Adams fired multiple shots at the victims, thus justifying separate convictions and sentences for each count.

Adams contends that he should not have received consecutive sentences. With respect to consecutive sentencing, the trial court stated the following:

> That Mr. Adams is a dangerous offender as defined by the statute is clear, he is a dangerous offender. He showed little or no regard for human life. He had no hesitation about committing the crime in which this risk was high. The circumstances of the offense themselves were aggravated. Numerous shots. He had to fire, reload, fire again, reload, using a weapon of his choice, armed with ammunition of his choice, which were rifle slugs. It wasn't bird shot; these were deadly, intended to be deadly loads. Extended confinement of this defendant is, is necessary to protect society. And the aggregate length of the sentences, total sentence must be reasonably relevant to the conduct for which he stands convicted.

In addition, he was on probation. Clearly he was on probation. He was under supervision of, or under probation from the Court from a previous offense which likewise justifies imposition of consecutive sentencing. He does have an extensive criminal history, going back to juvenile offenses of burglary and theft; continuing as an adult, principally alcohol related offenses . . . . So the Court finds that consecutive sentencing is warranted in Mr. Adams' case.

A trial court may impose consecutive sentences when a defendant has an extensive record of criminal activity or when a defendant is sentenced for an offense committed while on probation. Tenn. Code Ann. § 40-35-115(b)(1), (6). In addition, consecutive sentences may be imposed if "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). However, "consecutive sentences cannot be imposed unless the terms reasonably relate to the severity of the offenses committed and are necessary in order to protect the public from further serious criminal conduct by the defendant." State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995); see State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999) (stating that the Wilkerson findings that the sentences are necessary to protect the public and reasonably relate to the severity of the offenses apply only to consecutive sentences involving dangerous offenders). In Wilkerson, the supreme court held that "the Sentencing Reform Act requires the application of the sentencing principles set forth in the Act . . . in all cases. The Act requires principled justification for every sentence, including, of course, consecutive sentences." 905 S.W.2d at 938. Among those principles are that the sentence imposed "should be no greater than that deserved for the offense committed," and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4). The record shows that with respect to the imposition of consecutive sentencing, the trial court followed the statutory sentencing procedures, made appropriate findings of fact, and gave proper consideration to the sentencing principles. Thus, our review of the trial court's imposition of consecutive sentencing is de novo with a presumption of correctness. See Tenn. Code Ann. § 40-35-401(d); State v. Gutierrez, 5 S.W.2d 641, 646 (Tenn. 1999) (applying a presumption of correctness standard to one sentencing determination after concluding that the trial court erred in another).

Considering the foregoing, we hold that the record supports the trial court's imposition of consecutive sentencing. The trial court found that the nature of the offenses showed that the defendant was a dangerous offender from whom the public needs protection and that consecutive sentencing reasonably related to the severity of the offenses. The trial court also considered the defendant's criminal history and his inability to abide by the terms of his probation, factors which bear upon his amenability to rehabilitation. The defendant has not shown that the trial court erred by imposing consecutive sentencing.

### B. Holt's Sentence

At the sentencing hearing, Holt's aunt, Phyllis Beecham, testified that Holt's parents had divorced each other twice and that he had lived with various family members. She said that both

parents had drinking problems and that Holt lived in poverty. She said that Holt was respectful when he lived with her.

A presentence report was introduced into evidence. The report reflects that Holt was twenty-one years old at sentencing and has convictions from 1996 for public intoxication, two counts of underage possession of liquor, and unlawful drug paraphernalia use and activity. Holt was on probation at the time of the present offenses. The report reflects that Holt attended school until the ninth grade and was last employed with his uncle's roofing business in Nashville. Holt reported that he planned to return to Nashville but was arrested on the present offenses. He reported good physical and mental health. Holt stated that he first began drinking alcohol at age fourteen and drank heavily on the weekends at the time of the present offenses. He reported using marijuana from age fifteen until one year before his arrest.

The trial court applied the following enhancement factors, as listed in Tenn. Code Ann. § 40-35-114:

> (1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; [and]
> (8) The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community[.]

In mitigation, the trial court determined that Holt cooperated with the authorities by giving a statement and has no prior violent felony convictions. Tenn. Code Ann. § 40-35-113(13). The trial court imposed consecutive sentences, finding that:

> Mr. Holt was on probation at the time he committed these offenses. Mr. Holt does have a, a record of criminal conduct, most of which is alcohol related, but he does have several previous convictions. . . . There's no question but the facts of this offense exhibited little hesitation in committing offenses where the risk to human life was almost assured. Firing rifle slugs from a shotgun at a vehicle in which you knew people were inside, it clearly indicates dangerous conduct. . . . We must go further. In considering the severity of the offenses themselves, his prior convictions, in taking those together and considering whether or not this extended confinement is necessary to protect society from this Defendant's unwillingness to lead a productive life, which has been exhibited by his lifestyle, transient, sporadic employment, use and abuse of alcohol, violating probation, the Court finds that the sentences should run consecutively. The Court further finds that the aggregate length of this sentence, the total twenty (20) years, reasonably relates to the severity of the offenses for which he's been found guilty.

Initially, we note that the trial court erred by applying enhancement factor (8). The record shows that the trial court applied this factor because Holt was on probation at the time of the present offenses. As we previously stated, commission of the offense for which a defendant is being sentenced does not make factor (8) applicable. Hayes, 899 S.W.2d at 185-86. In light of the trial

court's error, we review the length of Holt's sentence <u>de novo</u> with no presumption of correctness. Factor (1) remains as the sole enhancement factor. We view it to be entitled to little weight, considering that Holt's criminal history is far from lengthy and does not involve violent offenses. The two mitigating factors apply but are entitled to marginal weight. Beginning at the minimum sentence within the range and considering the enhancement and mitigating factors, we believe that three-year sentences for each aggravated assault conviction are warranted by the record.

Holt challenges the trial court's imposition of consecutive sentences. He argues that the trial court stated that it found him to be a dangerous offender based upon his conduct in firing at the car but that the record does not support a finding that he engaged in such conduct. Essentially, he argues that the evidence is insufficient to support the convictions. We have already addressed this issue and view it to be without merit.

Holt was eligible for consecutive sentencing based upon his criminal history, the fact that he is a dangerous offender, and the fact that he was on probation at the time of the offenses. Tenn. Code Ann. § 40-35-115(b)(1), (4), (6). With respect to the trial court's finding Holt to be a dangerous offender, firing multiple shots at a carload of passengers is undoubtedly a serious offense and indicates that Holt had little hesitation about committing a crime in which the risk to human life was high. The trial court further found that consecutive sentences reasonably related to the severity of the offenses and were necessary to protect the public from the defendant's unwillingness to lead a productive lifestyle. The trial court's findings with respect to consecutive sentencing are entitled to a presumption of correctness. <u>See</u> Tenn. Code Ann. § 40-35-401(d); <u>Gutierrez</u>, slip op. at 9-10. Holt has not demonstrated that the trial court erred.

In consideration of the foregoing and the record as a whole, we affirm the defendants' convictions. Adams's sentences are modified to reflect a twenty-four-year sentence for the second degree murder conviction, and four-year sentences for each aggravated assault conviction, for a total sentence of forty years. Holt's sentences are modified to reflect sentences of three years for each aggravated assault conviction, for a total sentence of twelve years.