IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 13, 2002

## STATE OF TENNESSEE v. ANTHONY L. ROGERS

**Direct Appeal from the Circuit Court for Coffee County**
**No. 29,592      John W. Rollins, Judge**

---

**No. M2001-01729-CCA-R3-CD - Filed March 26, 2002**

---

The defendant, Anthony L. Rogers, was indicted for attempted second degree murder and two counts of aggravated assault. He pled guilty to one count of aggravated assault, a Class C felony, and the remaining counts were dismissed. The trial court sentenced the defendant as a Range II, multiple offender to eight years in the Tennessee Department of Correction. As his sole issue on appeal, he argues that the trial court erred in ordering his sentence to be served consecutively to a federal sentence. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JOHN EVERETT WILLIAMS, JJ., joined.

Robert S. Peters, Winchester, Tennessee, for the appellant, Anthony L. Rogers.

Paul G. Summers, Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; and C. Michael Layne, District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

At the sentencing hearing, the victim, Glenda Wright Maples, testified that on January 8, 1999, she was living in Manchester, Tennessee, and working as an insurance agent. The defendant was her live-in boyfriend. She testified that when she arrived home from work that day, the defendant was "extremely drunk. I don't know what he was on, but he was bouncing off the walls and stumbling all over the place." Ms. Maples went to the kitchen, sat down at a glass table to smoke a cigarette, and continued to observe the defendant. She said that when she stood up, the defendant came toward her and "got real close to [her] face." At that point, she told the defendant to leave or she would call the police. The defendant then "slammed" her up against the refrigerator and started beating her in the face with his fists. The defendant told her, "I'm going to kill you,

bitch." After the defendant knocked her to the floor, he choked her, tried to pull her eye out, kicked her, stomped her in the head, banged her head against the floor, and repetitively beat her in the eyes for a period of time that "seemed like forever." She said that she could no longer see after the first six or seven blows to her eyes because of the swelling and bleeding. While the defendant was beating her in the eyes, she told him she was sorry and he finally stopped. The defendant told her, "We have an understanding, don't we? You fell." As she was trying to reach the panic button on her alarm system in the house, she heard the defendant cock her pistol, which had been in her purse, and then felt the pistol being pushed against her chest. The defendant held the gun to her chest and said, "We have an understanding. You fell and hit your head on the table."

The victim testified that she next asked the defendant to get her a "rag" and a soft drink because she was bleeding and felt nauseous. The victim's mother, who lived next door, telephoned twice; the defendant answered both times and told her that the victim had fallen and he was going to take her to the hospital. Shortly thereafter, the doorbell rang and the victim heard her mother enter the house. The next thing the victim remembered was the "ambulance people" coming into the house and putting her on a stretcher. She initially told them that she fell on the table because the defendant was still in the room and she did not know where the gun was. Someone then whispered to her and asked her if the defendant had beaten her, and she nodded in the affirmative.

The victim was transported to the local medical center where she underwent a CAT scan, received stitches, and was hospitalized for three or four days for her injuries. She was then sent to Baptist Hospital in Nashville where she underwent a second CAT scan which showed that her right orbital bone around her eye had been completely destroyed. She underwent surgery during which plastic was inserted in place of the missing orbital bone. When asked to describe her permanent injuries, the victim testified:

> I have double vision when I look down. They can't correct that. I can see okay straight ahead, but if I look down, I'll fall, if I don't move my head. They have done extensive neurological testing. I have diffuse brain damage all over the brain, different places. I have very, very limited short-term memory. Intermediate memory is not very good. I can't figure out things. There is no hope for me to work again because I don't know what I'm doing half the time. I get lost and confused. I don't understand what I read or hear half the time. If you tell me a story or something to do, you may have to tell me three times. I'll forget it before I get out of the room and of course, to look at my eye, I know that it's disfigured. It doesn't look the same as it did. I have some hearing loss, too, in the left ear from being kicked. Dr. Marvel, I believe, did that test, I think, and I have seen several doctors. I have quite a bit of brain damage.

On cross-examination, the victim said that she had been receiving treatment for depression and obsessive-compulsive disorder since 1997 and that the defendant would steal her prescription

medication, Mepergan. She said that she had been approved to receive disability benefits for her severe osteoarthritis shortly before the incident, but that her disability at the time of the hearing was different from before as a result of the injuries the defendant inflicted upon her. She admitted that she knew the defendant was a "little strange" but said she did not know if the defendant had a psychiatric condition. The victim testified that she was afraid the defendant would "get" her if he was released from custody, and she felt the only reason she had been safe since the incident was because the defendant had been incarcerated.

Officer Brandon Tomberlin of the Manchester Police Department testified that he responded to calls to the victim's residence twice on January 8, 1999, first for a burglar alarm call at 3:46 p.m. and then again approximately forty-five minutes later to assist the Coffee County Ambulance Service. When Officer Tomberlin responded to the burglar alarm call, the defendant, who had a strong odor of alcohol about his person, came to the door and was "very, very uncooperative." The defendant told Tomberlin that he did not know the correct alarm code and that the lady who lived next door owned the house. Tomberlin went next door and spoke to the victim's mother, Ms. Maples, who said it was all right for the defendant to be at the residence. The defendant then told Ms. Maples, "Go get the gun," which Tomberlin took as a threat. Tomberlin radioed for assistance, and Officer Mike Tabor responded to the scene. Ms. Maples told the defendant that she was not going to get a gun and then went back inside her house. Officers Tomberlin and Tabor convinced the defendant to go back inside the residence and then left the scene.

Approximately forty-five minutes after the first call, Officers Tomberlin and Tabor again arrived at the victim's residence, this time in response to a domestic dispute. Officer Tomberlin observed the victim, whose eyes were swollen shut, on a stretcher. Tomberlin testified that the victim had been "beat[en] very bad, very badly beat[en]" and that he had "never seen anybody beaten that bad before." He said that he stayed in the living room with the defendant who was very calm and told him that the victim had fallen into a glass table. Officer Tabor spoke with the victim and concluded that the defendant had beaten the victim. Officer Tomberlin then placed the defendant in the patrol car. A large machete, which was made an exhibit at the hearing, was found near the front door.

The defendant, who was 39 years old at the time of the hearing, testified that his biological parents were a "Dutch-Russian businessman" and a "Saskatchewan Indian whore" and that he was adopted at birth by the hospital delivery room nurse and a Marine. He said that his adoptive father physically abused him from the age of five, that he was medicated as an adolescent "to the extreme, beyond the norm," and that he was a "methamphetamine junkie" before he started using marijuana on his own. He joined the military in 1979 at age 17 and said he suffered a "chemical alteration" while in the military. The defendant said he never received any psychiatric or professional help during childhood and that he had made no real effort to get psychiatric help until 1997 after the birth of his son.

The defendant stated that his "psychiatric history" began in 1987 after he had suicidal thoughts and multiple vehicular accidents in which he should have died. After his son was born in

1997, he went to a Veterans Administration hospital where he made a "half-ass effort" at detoxification and also tried to obtain psychiatric counseling but was unable to do so because of problems with TennCare. The defendant said that he had been diagnosed as "PTSD [post-traumatic stress disorder], atypical bipolar, psychotic, antisocial, delusional" and that he had been receiving disability benefits since 1993. He denied stealing the victim's Mepergan and said that the victim furnished him with whatever type of medication he wanted. He said that at the time of the incident he was taking Diazepam, Mepergan, Tegretol, Trazodone, and Naprosyn.

When questioned about the January 8, 1999, incident, the defendant said that if the victim "had not let 'bastard' come out of her mouth when I caught her in a compromising position with a half Chow, half German Shepherd the afternoon before, this situation would have never took place." He admitted that he "lost it" when the victim said "bastard" and admitted that he hit her in the eyes but denied destroying her right orbital bone. When shown a photograph of the victim's swollen face, the defendant replied, "It looks like there might be some cotton in that jaw there . . . from the way I'm seeing things. That looks like some cotton padding inside that jaw if you will look at the marks there, and if you'll look at the definitive edge of that jaw, that is not swelling. That's gauze inside of the mouth."[1] He admitted that he caused the bruising to the victim's face but denied choking her. When asked if he thought the victim inflicted the injuries upon herself, the defendant said, "When she slipped and let 'bastard' come out of her mouth, yes, sir, she sure did. That was the button she needed to push, and she knew it." The defendant denied having the machete in his hand during the incident.

As to his prior convictions, the defendant testified that in 1984 he had beaten a man in California because the man stole his dog and traded it for cocaine. The man's injuries resulted in his pancreas or spleen having to be removed. The defendant said he was sentenced to seven years but was paroled after thirty-three months. The defendant said his next conviction was in 1989 for aggravated assault[2] for which he served four years and twenty-nine days in the Tennessee Department of Correction. Regarding this incident, the defendant said he had beaten a man[3] who had five prior arson convictions and claimed he had been thanked by Hamilton County law enforcement officers for this assault.

When asked about a pending charge for stabbing a man on November 25, 1994, in Santa Rosa, New Mexico, the defendant said he had paid a $4000 fine which took care of that charge and

---

[1]Several photographs of the victim are included in the record on appeal and show very substantial bruising to the victim's face, neck, and arm, as well as a good deal of swelling.

[2]The presentence report reflects that his conviction was for assault with intent to commit second degree murder.

[3]The presentence report reflects that the victim in this incident was mentally retarded, was beaten by the defendant with a cane, and sustained injuries of blood clots to each eye socket, a broken nose, and approximately 150 stitches to his face and head. The victim also underwent five and one-half hours of surgery to reconstruct his facial bones.

denied fleeing to Tennessee. He admitted that he had stabbed the man in the hand because the man had made homosexual advances toward him. The victim's wound required seventeen stitches.

The defendant further admitted that he had been convicted in 1998 in Coffee County of unlawful use of a weapon, reckless burning, public intoxication, violation of an order of protection, assault, and domestic violence. When asked if he believed himself to be a danger to anyone he is around when he is not incarcerated, the defendant replied, "That is horse manure."

Laura Prosser, the probation officer who prepared the defendant's presentence report, testified that subsequent to compiling the report, she received a copy of the defendant's federal presentence report. Ms. Prosser said she had spoken with the federal prosecutor and federal probation officer regarding the defendant's criminal history. The federal report reflected that the defendant had also been convicted of DUI in Cumberland County in 1982. In the course of her investigation, Ms. Prosser discovered that the defendant had one felony and two misdemeanor convictions and an extensive record of criminal activity. The defendant had committed numerous crimes involving violence and weapons since the 1980s. His first offense was assault with a deadly weapon in 1984 at age 22. Since that time, there had been more or less a continuous history of criminal activity and violent criminal activity except for the periods when the defendant was incarcerated.

Ms. Prosser said that the defendant was difficult to interview and often did not respond appropriately to her questions. She said that the defendant had asked her to obtain records of his psychiatric condition, but she was unable to do so because the defendant had altered the authorization for release of information form to the extent that it was useless.

At the conclusion of the hearing, finding seven applicable enhancement factors and no mitigating factors, the trial court sentenced the defendant as a Range II, multiple offender, to eight years in the Department of Correction, to be served consecutively to his 120-month federal sentence which resulted from his conviction for felon in possession of a firearm pursuant to 18 U.S.C. § 922(g)(1).

## ANALYSIS

### Consecutive Sentencing

As his sole issue on appeal, the defendant claims the trial court erred in ordering his sentence to be served consecutively, rather than concurrently, to his federal sentence imposed on September 25, 2000, by the United States District Court for the Eastern District of Tennessee in Case No. 4:00-CR-6-001. Specifically, the defendant argues that the length of his federal sentence, 120 months, is substantial, that "a federal facility would have the resources and expertise to remedy the rather severe physical and mental problems of the defendant, and perhaps, those resources may not be available in the State system," and that "there is little chance that the unique domestic dynamics present in this assault situation will be repeated."

The defendant's presence report reflects the following prior convictions in Coffee County:

| | |
|---|---|
| 1/29/99 | Assault |
| 1/29/99 | Possession of Weapon with Intent to Go Armed |
| 1/29/99 | Reckless Burning |
| 1/29/99 | Violation of Order of Protection |
| 2/9/98 | Public Intoxication |
| 5/23/96 | Assault |
| 5/14/96 | Public Intoxication |
| 8/6/94 | Public Intoxication |

In addition, the report reflects that the defendant was convicted of assault with intent to commit second degree murder in 1989 in Hamilton County, Tennessee, and assault with bodily injury and possession of a makeshift weapon in jail in 1984 in San Diego County, California. He also had pending charges for felony escape in Coffee County, Tennessee, and carrying a deadly weapon, disorderly conduct, aggravated battery with a deadly weapon, and failure to appear in Guadalupe County, New Mexico.

In ordering consecutive sentencing, the trial court found that the defendant was a persistent offender, a multiple offender, and a dangerous offender. In its sentence memorandum, the court stated:

> This sentence is absolutely necessary to protect the public from further criminal conduct by the defendant. Anthony Leroy Rogers has a long criminal history demonstrating a clear disregard for the laws and morals of society, including multiple severe and violent criminal offenses and acts. This defendant has exhibited a repetitive tendency to unlawfully and severely injure people. He exhibits no remorse, only subjective justification for his unlawful and violent actions. There is every reason to believe that Anthony Leroy Rogers will continue to violate our criminal laws. Past efforts at rehabilitation have failed miserably.

As a general rule, consecutive sentences are imposed at the discretion of the trial court upon its consideration of one or more of the following statutory criteria:

(1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person as declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b). These criteria are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing.

"A trial court may impose consecutive sentences when a defendant has an extensive record of criminal activity or when a defendant is sentenced for an offense committed while on probation." State v. Adams, 45 S.W.3d 46, 62 (Tenn. Crim. App. 2000) (citing Tenn. Code Ann. § 40-35-115(b)(1) & (6)), perm. to appeal denied (Tenn. 2001). Consecutive sentences may be imposed if "'[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high.'" Id. (quoting Tenn. Code Ann. § 40-35-115(b)(4)). Furthermore, "'consecutive sentences cannot be imposed unless the terms reasonably relate to the severity of the offenses committed and are necessary in order to protect the public from further serious criminal conduct by the defendant.'" Id. (quoting State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995)).

This record reflects that the trial court, in imposing consecutive sentences, followed the statutory sentencing procedures, made appropriate findings of fact, and gave proper consideration to the sentencing principles. Therefore, our review of the imposition of consecutive sentencing by the trial court is *de novo* with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d); Adams, 45 S.W.3d at 62.

Applying the foregoing, we conclude that the record supports the trial court's imposition of consecutive sentences. The trial court found that the defendant has an extensive criminal record, including acts of violence; thus, the defendant is a dangerous offender from whom the public needs protection. In ordering that the defendant's sentence be served consecutively to his federal sentence, partially based on his being a dangerous offender, the trial court made the necessary "specific findings regarding the severity of the offenses and the necessity to protect society," as required by State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999). The defendant's criminal history and his failure to abide by the terms of probation are factors that bear upon his rehabilitative potential, which appears to be quite low. The record clearly supports the trial court's decision to impose consecutive sentencing.

## CONCLUSION

Based upon the foregoing reasoning and authorities, we affirm the judgment of the trial court in imposing consecutive sentencing.

_____
ALAN E. GLENN, JUDGE