IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 8, 2002

## STATE OF TENNESSEE v. THADDEUS MORRIS

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 00-12635, 00-12636, 00-12637, 00-12638     Chris Craft, Judge**

---

**No. W2001-01691-CCA-R3-CD  - Filed February 15, 2002**

---

The defendant, Thaddeus Morris, was convicted of three counts of assault, three counts of reckless aggravated assault, one count of aggravated robbery, and one count of carjacking following a jury trial. The trial court merged the three assault convictions with the three reckless aggravated assault convictions and the aggravated robbery conviction with the carjacking conviction. The defendant was sentenced to seven years, six months for each of the reckless aggravated assault convictions, with two of the sentences to be served concurrently and the third to be served consecutively. For the carjacking conviction, the trial court sentenced the defendant to twelve years to be served consecutively to the third reckless aggravated assault sentence, for an effective sentence of twenty-seven years in the Department of Correction. On appeal, the defendant argues: (1) the evidence was insufficient to support his convictions for carjacking and aggravated robbery; (2) the trial court erred by not including "moral certainty" in its jury instruction on reasonable doubt; (3) cumulative error occurred during the trial; and (4) the trial court erred in imposing consecutive sentencing. After a careful review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and JOE G. RILEY, JJ., joined.

Juni S. Ganguli, Memphis, Tennessee, for the appellant, Thaddeus Morris.

Paul G. Summers, Attorney General and Reporter; Angele M. Gregory, Assistant Attorney General; William L. Gibbons, District Attorney General; and James Lammey, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

<u>**FACTS**</u>

On April 24, 2000, Mary Austin, who was on her way home from church with her family, stopped at an automated teller machine ("ATM") on Poplar Avenue near Palisade Street in Memphis to obtain cash to purchase food for the family's dinner. In the vehicle with Mrs. Austin were her husband, Michael Austin; her two children, Antionette Jackson and Michael Jackson; and her niece, Jurie Austin. Mrs. Austin was driving the vehicle; Mr. Austin was in the front passenger seat; and the three children were in the backseat. The Austins had purchased their 1999 Grand Cherokee Laredo for approximately $23,000 less than a month before the carjacking occurred, and the vehicle still had the drive-out tag displayed on it.

Mrs. Austin testified at trial that when she stopped at the ATM, she parked her vehicle directly in front of the door to the ATM and left the engine running and the headlights on. Mr. Austin and the children remained in the vehicle, listening and singing along to gospel music. Mrs. Austin opened the driver's side door, which caused the vehicle's interior lights to come on, retrieved her purse from the rear of the vehicle, and then entered the ATM. After she completed her transaction and turned around to go out, she saw Mr. Austin running behind their vehicle and yelling, "[N]o, no, no, stop. No, stop." Mr. Austin told her that a man had gotten into their vehicle, and the children were still inside the vehicle. Mrs. Austin began chasing the vehicle as well. As the vehicle was exiting out of the parking lot, the driver slammed on the brakes and one of the back doors opened. Mrs. Austin saw her daughter, with one leg out of the vehicle, attempting to get out, but before she could get completely out, the driver took off and she fell out onto the grass. While Mrs. Austin was checking on her daughter, she saw the rear door on the driver's side of the vehicle open and her son and niece come out "like rolling in the street." Mrs. Austin estimated the vehicle was traveling twenty-five to thirty miles per hour when her son and niece fell out. The driver of the vehicle then turned onto Poplar Avenue and that was the last Mrs. Austin saw of her vehicle until it was returned to her three days later. Mrs. Austin testified that she did not see who took her vehicle.

Michael Austin testified that just before Mrs. Austin got out of their vehicle at the ATM, he observed, from the rearview mirror, a person across the street. Mr. Austin was sitting in the front passenger seat with his door ajar which had caused the interior lights to come on. Moments later, a man, whom Mr. Austin identified in the courtroom as the defendant, approached the vehicle, opened the driver's side door, and demanded Mr. Austin to get out of the vehicle or be shot. Although he did not see a gun, Mr. Austin said the defendant, who was wearing dark pants and a black hooded jacket, had his hand inside his jacket pocket. Mr. Austin asked the defendant, "What's going on?" The defendant again told Mr. Austin to get out or he would shoot. Believing that the defendant had a weapon, Mr. Austin reluctantly got out of the vehicle, and the defendant proceeded to drive away with the children still in the backseat. Mr. Austin gave chase but could not catch the vehicle. Mr. Austin did not see the children fall out of the vehicle and, believing that they were still inside, ran out onto Poplar Avenue and flagged down a passing motorist. The motorist allowed Mr. Austin into his car, and together they pursued the defendant but were unable to catch him because he was driving at a high rate of speed. As Mr. Austin and the motorist were returning to the ATM parking lot, they saw two police officers at a nearby service station and stopped to ask for assistance.

The officers drove Mr. Austin back to the ATM parking lot where he then saw the children and realized they had made it out of the vehicle.

Jurie Austin, who was 17 years old at the time of the trial, testified that she was living with her uncle and aunt, Michael and Mary Austin, on April 24, 2000. She said that when her aunt stopped at the ATM that evening, she was sitting in the backseat behind the driver's seat and noticed a man coming toward their vehicle from her left. The man got into the vehicle, and her uncle got out of the vehicle and was trying to make his way to the driver's side door when the man began to drive away. She did not see a weapon, but the man had his right hand in his right jacket pocket and "it fit like something was in his pocket." The man told her and her cousins to "get out or I'm going to kill y'all." The children were unable to get out on their first attempt because of the vehicle's automatic child safety locking system. Her cousin, Antionette Jackson, managed to jump out of the vehicle when it "braked hard and stopped." Believing that she would die if she did not get out of the vehicle, Jurie grabbed her other cousin, Michael Jackson, and "fell" out of the vehicle while it was moving. Jurie testified she was taken to the hospital by ambulance, and that she "messed up [her] hand and [her] side was bruised very bad. Mainly [her] side." She said that she sustained an injury, approximately twelve inches long, to her left side around her hip. She testified that she could not identify the defendant from a photographic line-up the day after the incident but was "maybe sixty-five percent sure" at trial that the defendant was the man who got into the vehicle and threatened her life.

Antionette Jackson, age 14 at the time of trial, testified she was riding in the backseat of the vehicle behind the passenger seat on the night of the incident. She said that a man, whom she identified as the defendant, opened the driver's side door and told her father, Mr. Austin, to get out or he would shoot him. Antionette said that the defendant was pointing "something," which she believed to be a gun in his pocket, at Mr. Austin when he told him to get out. The defendant got in the vehicle, started driving fast, and then looked back to her, her brother, and her cousin in the backseat and told them to get out or he would kill them. When the defendant "braked hard" and stopped the vehicle, Antionette attempted to get out, but the defendant started driving again which caused her to fall out onto the grass. She said that the vehicle hit her and caused a "sharp sting" in her left leg.

Michael Jackson, age 11 at the time of the trial, testified that he was sitting in the middle of the backseat of the vehicle when the incident occurred. A man got in the vehicle on the driver's side and told his father to get out or he would shoot him. Michael said he did not see a gun, but the man had his hand in his pocket when he ordered his father to get out. Michael testified that his sister, Antionette, fell out of the vehicle while it was "skeeting off." He and his cousin managed to jump out of the vehicle and rolled into the street. Michael said that his right hand was injured as a result and that he was taken to the hospital. Michael identified the defendant from a photographic line-up shown to him the day after the incident as the man who took the vehicle. He also identified the defendant in the courtroom.

Officer Cleaven Foster of the Memphis Police Department testified that he stopped the defendant on April 25, 2000, the day after the incident, for a traffic violation. When he asked the defendant for his driver's license, the defendant replied that he did not have one in his possession, so Officer Foster detained the defendant. A search of the defendant's person revealed a green leafy substance in his right front pocket and Michael Austin's driver's license. The defendant told Foster that Austin was his cousin. No weapon was found on the defendant's person or in the vehicle. Foster had the vehicle identification number on the vehicle the defendant was driving checked, which came back showing the vehicle had been stolen. Foster testified that as he was handcuffing the defendant, the defendant told him that he had taken the vehicle the previous day.

The defendant, a twenty-one-year-old high school dropout at the time of trial, testified that he had been receiving treatment for mental problems and had just gotten out of the hospital the day before the incident. He admitted that on April 24, 2000, he was walking on Poplar Avenue looking for a car to steal but denied having a gun. He noticed the Austins' vehicle because the motor was running and the headlights and taillights were on. When he saw someone get out of the vehicle, he ran across the street to the vehicle and opened the driver's door. He denied saying or waving anything at Michael Austin and said that he did not have either of his hands in his pockets. The defendant said he did not see the children in the backseat initially. He testified that he began driving the vehicle with both hands and then heard the children in the backseat. He said he hit the brakes hard and stopped to let the children out of the vehicle. He denied ever threatening the children if they did not get out of the vehicle. He then left the parking lot of the ATM and proceeded down Poplar Avenue. The defendant said he slept in the vehicle that night and was arrested the next day. The defendant admitted that he gave a statement to the police wherein he confessed to taking the Austins' vehicle. When asked if he believed himself to be a thief, the defendant replied, "Most likely I would, yes, sir."

## ANALYSIS

### I. Sufficiency of Evidence

The defendant asserts that the evidence is insufficient to justify a finding of guilt beyond a reasonable doubt of aggravated robbery and carjacking. However, since the aggravated robbery conviction was merged into the carjacking conviction, it is necessary for us to consider the sufficiency of the evidence only as to the latter.

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). See also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to

-4-

be given the evidence, and all factual issues are resolved by the trier of fact.  See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."  State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).  Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).  A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient.  See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). When the credibility of the witnesses was resolved by the jury in favor of the State, the appellate court "may not reconsider the jury's credibility assessments."  State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000), cert. denied, ___U.S. ___, 121 S. Ct. 2600 (2001).

Carjacking is "the intentional or knowing taking of a motor vehicle from the possession of another by use of:  (1) [a] deadly weapon; or (2) [f]orce or intimidation."  Tenn. Code Ann. § 39-13-404 (1997).  The indictment in this matter alleged that the defendant obtained possession of the motor vehicle from Michael Austin "by use of intimidation."

The defendant asserts that there is no proof he possessed a deadly weapon to support his conviction for carjacking and that Michael Austin's testimony that he was intimidated by the defendant "is rebutted by [Austin's] own statements."  Austin testified that the defendant twice threatened to shoot him if he did not get out of the vehicle.  The only reason Austin then got out, leaving the children inside, was because he "thought [the defendant] had a weapon."  By their verdict, it is obvious that the jury believed this testimony, as was their right, and resolved any alleged inconsistencies in favor of the State.  Accordingly, we conclude that the evidence presented at trial was sufficient to sustain the conviction for carjacking.

## II.  Jury Instruction

The defendant complains that the trial court failed to instruct the jury as to the term "moral certainty" in its reasonable doubt instruction.

In this matter, the trial court gave the following instruction to the jury as to "reasonable doubt":[1]

> Reasonable doubt is that doubt created by an investigation of all the proof in the case and an inability after such investigation to let the mind rest easily upon the certainty of guilt. Reasonable doubt does not mean a doubt that may arise from possibility. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required and this certainty is required as to every element of proof needed to constitute the offense.

This language is nearly identical to the "reasonable doubt" instruction set out in the fifth and sixth editions of the Tennessee Pattern Jury Instructions, T.P.I.–Crim. 2.03. As to the instructions given, the defendant argues that "the trial court erred in failing to charge 'moral certainty' within the charge for reasonable doubt." Although the trial transcript includes a discussion of the jury instructions to be given, it does not include comments regarding the reasonable doubt instruction. Thus, assuming that the printed instructions in the technical record are those given to the jury, the trial court did include the phrase "moral certainty" when instructing as to reasonable doubt. Thus, we conclude that this assignment is without merit.

### III. Cumulative Error

The defendant asserts that the cumulative effect of the aforementioned errors entitles him to a new trial. The State counters that the defendant has only raised one trial-related error, the trial court's failure to include "moral certainty" in its jury instruction on reasonable doubt. We agree with the State that only one trial error has been raised, and this claimed error has no merit. There is no cumulative effect from one assignment of error. Thus, this issue is without merit.

### IV. Consecutive Sentencing

Citing State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995), the defendant asserts that the trial court erred in ordering consecutive sentences, in that, the trial court failed to find that the length of the total term of imprisonment was necessary to protect the public against further criminal conduct by the defendant and that consecutive sentences reasonably related to the severity of the offenses committed. The State counters that the trial court clearly considered the requisite factors in imposing consecutive sentences and determined that confinement was necessary to protect society from the defendant's actions and reasonably related to the severity of the offenses.

The party challenging the sentences imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; State

---

[1] Although the trial transcript does not include the jury instructions, they are contained in the technical record.

v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). Thus, in this case, the defendant has the burden of illustrating the sentence imposed by the trial court is erroneous.

The trial court sentenced the defendant, as a Range I, standard offender, to twelve years for the carjacking conviction and, as a Range II, multiple offender, to seven years, six months for each reckless aggravated assault conviction, ordering that the reckless aggravated assault convictions involving Michael Jackson and Antionette Jackson be served concurrently. However, the trial court ordered that the sentence for the reckless aggravated assault upon Jurie Austin be served consecutively to the concurrent sentences involving Michael Jackson and Antoinette Jackson, for a total of fifteen years, and that the twelve-year sentence for carjacking be served consecutively to the fifteen-year sentence, for an effective sentence of twenty-seven years.

In determining that the defendant's sentences should be served consecutively, the trial court stated:

> I find that he's a dangerous offender, his behavior indicates little or no regard for human life, and no hesitation about committing a crime for which the risk to human life is high, not only from his violent past as a juvenile but also because in this case he threatened this man's life. And after the man left and he got in his car he then pulled off at a high rate of speed and one of the children tried to get out of the car.
>
> Jurie J-u-r-i-e Austin testified. She said, "I tried to push him out but he just kept driving. He had his hand in his pocket, I felt I would die if I didn't get out of the vehicle." And she tried to get out, he sped away and she rolled in the street, was injured, her side was bruised very badly and her hand was messed up. And then after she jumped out he had a chance to stop and let the other two children out and he still refused to again. Drove off with those other two children.[2]
>
> Michael Jackson – Michael Jackson, who was 10 years old at the time, injured his hand. Antionette Jackson was not injured. But looking at the Defendant's testimony about he didn't know they were there, well, Antionette, for instance – . . ., testified at the trial that the Defendant seemed to know that they were there and never indicated he was in the least surprised that the kids were in the car.

---

[2]Antionette Jackson jumped out of the vehicle first, followed soon thereafter by Jurie Austin and Michael Jackson.

And I find that Mr. Morris just didn't care about anybody, he didn't care about the children or what would happen to them. And that's pretty scarey [sic]. In addition to his other matters I also find in 4035.115 [sic] that Mr. Morris is a Defendant who's an offender, his record of criminal activity is extensive. I'm aware of our case holdings, the consecutive sentences shouldn't be routinely imposed, the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses.

And I find that proof is established that the record of the Defendant's behavior indicated little or no regard for human life. I didn't find that enhancement factor for purposes of sentencing because the Legislature had taken into account, but in finding whether or not it should be consecutive I do find that he had little regard for human life.

He didn't hesitate about committing a crime in which the risk to human life was high in this case. The circumstances surrounding the commission of the offense were aggravated, in my opinion, with the children and the way he was going – the children's age and their helplessness, even though they weren't particularly vulnerable as far as sentencing.

I also feel that confinement for an extended period of time is necessary to protect society. I think as soon as we let Mr. Morris out he is, although he could work, he's going to choose to steal, and looks like he's becoming violent in his stealing. And also the aggregate length of the sentences, if they're consecutive I think they reasonably relate to the offenses except for the last two kids. I think the last two kids, the 10 year old and Antionette should be run concurrently.

But Jurie, J-u-r-i-e, was injured, and the father who had to see Mr. Morris drive off with his children and their friend, I think those sentences should be run consecutively. A 36 year sentence or a 30 in this case, a 34 and a half year sentence I think would be a little too much to reasonably relate to the severity of the offenses committed for those last two children in the car.

So I'm going to order that the 12 year sentence for the carjacking run consecutively to Jurie Austin's indictment of the seven and a half year sentence, which would be Indictment No. 00-12636, and that that should be run consecutively to the other two indictments which should be concurrent with each other.

For a total sentence of 12 years plus seven and a half years, plus two 7 and a half year sentences consecutive, which would be 27 years. I'm also going to run those 26 years consecutive to the 10 day sentence that I gave Mr. Morris for contempt of court when he cursed at me after threatening Ms. Mozingo.[3]

"A trial court may impose consecutive sentences when a defendant has an extensive record of criminal activity or when a defendant is sentenced for an offense committed while on probation." State v. Adams, 45 S.W.3d 46, 62 (Tenn. Crim. App. 2000) (citing Tenn. Code Ann. § 40-35-115(b)(1) & (6)), perm. to appeal denied (Tenn. 2001). Consecutive sentences may be imposed if "'[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high.'" Id. (quoting Tenn. Code Ann. § 40-35-115(b)(4)). Furthermore, "'consecutive sentences cannot be imposed unless the terms reasonably relate to the severity of the offenses committed and are necessary in order to protect the public from further serious criminal conduct by the defendant.'" Id. (quoting State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995)).

This record reflects that the trial court, in imposing consecutive sentences, followed the statutory sentencing procedures, made appropriate findings of fact, and gave proper consideration to the sentencing principles. Therefore, our review of the imposition of consecutive sentencing by the trial court is *de novo* with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d); Adams, 45 S.W.3d at 62.

Applying the foregoing, we conclude that the record supports the trial court's imposition of consecutive sentences. The trial court found that the defendant has an extensive criminal record, including acts of violence; thus, the defendant is a dangerous offender from whom the public needs protection. In sentencing the defendant to consecutive terms, partially based on his being a dangerous offender, the trial court made the necessary "specific findings regarding the severity of the offenses and the necessity to protect society," as required by State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999). The defendant's criminal history and his failure to abide by the terms of probation are factors that bear upon his rehabilitation. The defendant has failed to meet his burden in that the trial court erred in imposing consecutive sentences. This issue is without merit.

---

[3] At the sentencing hearing, Lawrence Russell White, a Shelby County assistant public defender, testified that he was in the courtroom with the defendant on January 12, 2001, when the defendant became angry and "highly agitated" while on the stand. White said that when the defendant came down from the stand, he walked behind the table where White and Kathryn L. Mozingo, another assistant public defender, were seated. The defendant told Ms. Mozingo, "Stupid ass bitch, I'm going to kill you."

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE