IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 28, 2003

## MICHAEL C. ADAMS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Sullivan County**
**No. C46,200     R. Jerry Beck, Judge**

_____

**No. E2003-00658-CCA-R3-PC**
**December 22, 2003**
_____

The petitioner, Michael C. Adams, appeals the denial of his petition for post-conviction relief from his conviction for second degree murder and four counts of aggravated assault. He argues that he was denied effective assistance of counsel because his trial counsel failed to properly advise him of his right to testify and failed to properly communicate a plea offer and recommended that he proceed to trial. Following our review, we affirm the post-conviction court's denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOSEPH M. TIPTON, J., joined.

Michael J. LaGuardia, Kingsport, Tennessee, for the appellant, Michael C. Adams.

Paul G. Summers, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; and H. Greeley Wells, Jr., District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

We first will set out the facts which were the basis for the prosecution of the petitioner. On the evening of May 31, 1997, a series of threatening telephone calls were made to the Commerton residence in Sullivan County. Mary Commerton, her two children, Chris and Melissa, and two of Chris's friends, Scott Berry and Travis Freese, decided to confront the caller and drove to his location. They were unarmed. When they arrived, a confrontation ensued, which resulted in several shots being fired at Mrs. Commerton's vehicle. One of the shots hit and killed Mr. Freese. Mrs. Commerton and the other children fled the scene on foot. They later returned to the scene with a sheriff's deputy, and the petitioner and several others were taken into custody. A jury convicted the petitioner of second degree murder and four counts of aggravated assault, and he received a total sentence of forty-nine years. On direct appeal, his convictions were affirmed, but his sentence was

reduced to forty years, twenty-four years for the second degree murder conviction and four years for each of the aggravated assault convictions, the sentences to run consecutively. State v. Adams, 45 S.W.3d 46, 50 (Tenn. Crim. App. 2000), perm. to appeal denied (Tenn. 2001). The petitioner then filed a *pro se* petition for post-conviction relief, which was amended twice after counsel was appointed.

At the post-conviction hearing, the petitioner testified that he only met with his attorneys twice prior to trial, and that these meetings lasted "for about three (3) minutes each time." He said that his attorneys did not keep him informed and did not advise him of their trial strategy. He also said that his attorneys often spoke "amongst themselves" and described his involvement in the case as merely being "present."

The petitioner stated that he not did testify at trial and did not discuss his right to testify with his attorneys either before trial, during trial, or after the close of all the proof. He recalled, at some point before the prosecution rested, being removed from the courtroom and placed in a holding cell during a court recess. He said that, during this time, his attorneys also did not explain his right to testify, although admitting that his attorneys told him, prior to trial and sometime near preliminary motions, that, because of a statement to law enforcement officers, it would not be in his best interest to testify.

The petitioner further testified that, while he was in the holding cell, his attorneys presented him a plea offer that he serve twenty-five years at eighty-five percent. However, he did not specify whether this offer was for all of the charges or for the murder charge only. He said that junior trial counsel advised him not to take the plea because he felt they had a strong case, and he told junior trial counsel to reject the plea agreement.

Lead trial counsel testified that he and his son represented the petitioner at trial. After the petitioner was arrested, lead counsel interviewed him at the jail at least ten times and discussed various matters during these visits. The petitioner had made three statements, two of which were incriminating. In the first statement, the petitioner said that he went to Wal-Mart and purchased two Remington single-shot shotguns and six boxes of ammunition. He returned to Billy Thrift's trailer, and "all the guys fired the guns." In the second statement, the petitioner admitted that he and two other individuals began shooting at a car in the driveway of the trailer. Lead trial counsel said that he did not file a motion to suppress the statements because he had an agreement with the prosecution that they would not be used at trial, unless the petitioner chose to testify. Lead trial counsel testified that he discussed with the petitioner, on multiple occasions, about his right to testify and whether he should testify. He told the petitioner that very few people are acquitted in murder cases unless they testify. He said that the petitioner did not want to testify because he was afraid of cross-examination, and that he had a particular problem about being cross-examined about the statements he made to police. He said that he went over these incriminating statements with the petitioner several times prior to trial, and that the petitioner expressed fear about being cross-examined because he thought he might get confused and admit to things he did not do.

During trial, and while the petitioner was in the holding cell, lead counsel again explained to the petitioner his right to testify. During this conversation, he explained that Amanda Hurt was the prosecution's key witness, and her testimony was "most probative on the issue of guilt of [the petitioner]." He explained to the petitioner the need to rebut her testimony, and, after the prosecution closed its proof, he again told the petitioner that it would be hard to get an acquittal without his testimony and urged him to testify:

> I told him that I'd been in fifty (50) or sixty (60) Murder cases and it's tough to get an acquittal unless a defendant testifies. I told him a jury wants to know. If you say you didn't kill somebody, stand up and tell me that. But I explained the theories of the law, presumption of innocence and all that, and he didn't have to testify, couldn't be made to, that there's some pros and cons to it. He, from day one, always told me he did not want to testify. And he was frightened that he could never be prepared to withstand cross examination based, probably, on two things. His mental capacity and the facts of the case. And statements he had made incidental to the facts of the case. And I certainly wasn't going to put him on the witness stand unprepared should he, at the last minute, change his mind. So as best I was able to, I tried to prepare him to testify. And as recently as the last recess, I told him, words to the effect, you may improve your chance by testifying.

He said that the petitioner made a "fully informed" decision not to testify. At the close of all the proof, he told the court that he had consulted with the petitioner many times, before trial, during trial, and in "in the last hour," and it was the petitioner's decision not to testify. He explained that "in the last hour" referred to the conversations he had with the petitioner during the court's recess and at the counsel table. He said the court then questioned the petitioner, and the petitioner told the court that it was his decision not to testify.

He recalled that, prior to trial, there was some discussion with the petitioner about pleading guilty to second degree murder in exchange for a sentence of twenty-five years. However, there was no plea offer from the prosecution for such a sentence:

> There was some discussion that a plea offer would have to originate [i]n effect from the [petitioner]. And of course [the district attorney general] tried the case with [the assistant district attorney general]. It always indicated [the plea] would have to be something that satisfied [the prosecution], and that [the prosecution] would have to take it up with the family. The plea proposal, as occurs on about every case, something's offered. But there was never, never an offer of less than First Degree Murder.

-3-

He testified that he discussed this proposal with the petitioner, but the petitioner would not accept such a lengthy sentence. He also said that the twenty-four-year sentence was for the murder charge only and did not include the aggravated assault charges.

Junior trial counsel testified that his father was lead counsel for the petitioner, but he assisted with the preparation of the case. He said that after the trial began, the prosecution offered the petitioner a plea of life with parole, which the petitioner turned down. He could not recall the specifics of the offer but remembered that it was for first degree murder. He said that after the State closed its proof and the court recessed, he and his father met with the petitioner in a holding cell. He specifically recalled speaking with the petitioner about his right to testify. He said the petitioner did not want to testify. He also recalled that his father communicated to the petitioner the benefits of him testifying and explained to him the burden of proof. There were also similar discussions during trial, both before and after the prosecution put on its proof.

The district attorney general, the lead prosecutor at trial, testified that he was responsible for any plea agreement that would have been made to petitioner. He said that he never made a plea offer for less than first degree murder. He specifically denied making an offer that would have allowed the petitioner to plead guilty to second degree murder, nor did he make an offer for "twenty-five (25) years on anything." He stated that although he and lead counsel discussed the possibility of allowing the petitioner to plead guilty to second degree murder, he never made such an offer.

Lead counsel was then recalled to the stand and testified that the State had not offered to allow the petitioner to plead to second degree murder:

> [W]e [referring to himself and the district attorney general] talked several times about the trial prior to the trial; severance, whatever. And I always, in every case, try to negotiate if I can. I was steadfastly told that First Degree Murder is the only acceptable verdict to the State. And the ramifications of the total sentence, the General wanted to confer with Mr. Freese, he being the father of the deceased. And I always had the impression they would not accept a lesser plea. I discussed this talk about [the petitioner] and twenty-five (25) years and that, you know, you talk to your client about, well, what would suit you if we could talk the other side into it? But we could never talk the other side into it, so that was all wasted conversation, in a sense.

He also stated that he did not have any specific recollection of a plea agreement that would enable the petitioner to serve twenty-five years at eighty-five percent, but unsuccessfully spoke with the prosecution about reducing the charges.

## ANALYSIS

### I. Standard of Review

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-210(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the trial court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issues of deficient performance of counsel and possible prejudice to the defense are mixed questions of law and fact and, thus, subject to *de novo* review by the appellate court. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

To determine the competence of counsel, Tennessee courts have applied standards developed in federal case law. See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The United States Supreme Court articulated the standard in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), which is widely accepted as the appropriate standard for all claims of a convicted petitioner that counsel's assistance was defective. The standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results." Id. at 685, 104 S. Ct. at 2063. The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064. The Strickland Court further explained the meaning of "deficient performance" in the first prong of the test in the following way:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of

legitimate decisions regarding how best to represent a criminal defendant.

Id. at 688-89, 104 S. Ct. at 2065. The petitioner must establish "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)).

As for the prejudice prong of the test, the Strickland Court stated: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994) (concluding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different").

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

We note that when post-conviction proceedings have included a full evidentiary hearing, as was true in this case, the trial judge's findings of fact and conclusions of law are given the effect and weight of a jury verdict, and this court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

By written order, the trial court denied the petition for post-conviction relief, making the following findings:

> The court gives credit to the testimony of petitioner's original counsel, and specifically finds that:
>
> (A) The discussion of the wisdom of the defendant/petitioner testifying was raised on several occasions, and up until the time at trial where the [petitioner] elected not to testify.
>
> (B) Prior to the decision being made not to testify, the petitioner's original counsel had made attempts to prepare his client to testify and this fact is set out in the testimony of [lead trial counsel][.]

(C) The transcript from the original trial . . . clearly and beyond any doubt establishes that the trial judge advised the [petitioner] of his right to testify or not testify, and the question or statements of [the trial judge] in many respects mirror the language contained in the later arising case of State v. Momon.

(D) The petitioner has failed to establish that he is entitled to Post Conviction Relief by clear and convincing proof. Further, although not presently the law, the petitioner has failed to establish, by a preponderance of the evidence, that his is entitled to Post Conviction Relief.

(E) Considering the cases of Strickland v. Washington, 466 U.S. 668, 104 S[.] Ct. 2052 (1984), and Baxter v. Rose, 523 SW2d 930 (Tenn. 1975), and other applicable law, the petitioner has failed to establish that he had ineffective assistance of counsel at his original trial or on appeal. The court specifically finds that the petitioner had effective counsel at trial and on appeal.

(F) The petitioner has failed to establish that counsel failed to convey a plea offer.

## A. Right to Testify

The petitioner argues that trial counsel did not comply with the procedural requirements concerning his right to testify, as outlined in Momon v. State, 18 S.W.3d 152 (Tenn. 1999), saying that, prior to trial, "he was advised by trial counsel that it was not in his best interest to testify," and that "there was no further conversation concerning the right to testify other than the colloquy at the defense table at the end of the State's proof." The petitioner also notes that trial counsel stated that he had spoken with the petitioner prior to and sometime during trial, but he never made reference to a discussion in which he advised the petitioner of his right to testify after hearing all of the State's proof.

At the post-conviction hearing, the petitioner testified that he did not have any conversation with his trial counsel about his right to testify either before or after the trial, although, according to the petitioner, lead counsel told him that it was not in his best interest to testify because he could be cross-examined about the statements he made to the police. Conversely, lead counsel testified that he advised the petitioner of his right to testify on multiple occasions before and during trial, and that, in his opinion, few defendants were acquitted of murder unless they testified. He said that the petitioner stated he was afraid of being cross-examined and elected not to testify.

In the dismissal order, the post-conviction court set out a portion of the interchange between the petitioner and the trial court as to the petitioner's testifying in his behalf at the trial:

[LEAD COUNSEL]: Your Honor, I've consulted with [the petitioner] many times, and more recently, just before this trial and during this trial, and in the last hour, and it is the decision of [the petitioner] not to testify in this case. [The petitioner] understands he has a full right to testify. Is that right [the petitioner]?

[THE PETITIONER]: Yes, sir.

THE COURT: Thank you. But, . . . you have heard during the course of the trial, in the opening instructions I gave to this Jury, that the [petitioner] does not have to testify. You have an absolute right not to testify. If you chose to testify, you may do so, and the Jury would consider your testimony in light of all the facts and circumstances in the case. This being an absolute right, it is your choice, and a choice that, that only you, with the advi[c]e of your attorneys, can make. And, . . . let me take [the codefendant] first. Do I understand that you, you understand fully, that you do have the right to testify or not testify, as you choose?

[CODEFENDANT]: Yes, sir, Your Honor.

THE COURT: And that in your choosing not to testify, this Jury will be instructed by the Court that they cannot hold that against you?

[CODEFENDANT]: Yes, sir, Your Honor.

THE COURT: Because you have that right. And is it your decision and your choice not to testify in this case?

[CODEFENDANT]: Yes, sir.

THE COURT: [The petitioner], likewise.

[THE PETITIONER]: Yes, sir.

THE COURT: Do you understand that right?

[THE PETITIONER]: Yes, sir.

THE COURT: And is it your decision not to testify in your defense in this case?

[THE PETITIONER]: Yes, sir.

THE COURT: Well, the Court will find that they each understandably and knowingly have made that decision and just place that on the record at this point in time.

The petitioner argues that he is entitled to post-conviction relief under the holding of Momon v. State, 18 S.W.3d 152, 161-62 (Tenn. 1999), wherein our supreme court held that a criminal defendant's right to testify is a fundamental constitutional right that may be waived only by the defendant and requiring that the defendant's waiver be made on the record. However, the court explained that its holding was not retroactive, stating: "[T]he procedures adopted herein do not establish a new constitutional rule which must be retroactively applied." Id. at 163.

As to this issue, the post-conviction court found that trial counsel had discussed on several occasions up until the time of trial and that the petitioner elected not to testify, although counsel had attempted to prepare his trial testimony. Further, the post-conviction court determined that the trial court had adequately explained to the petitioner his right to testify or decline to do so. We conclude that the record supports these determinations.

## B. Plea Offer

The petitioner argues that trial counsel improperly communicated to him a sentence range associated with a plea offer and thereafter advised him to reject the offer and proceed to trial. He further contends that under Deon Braden v. State, No. 01C01-9708-CC-00351, 1998 Tenn. Crim. App. LEXIS 744 (Tenn. Crim. App. July 15, 1998), a trial counsel's failure to advise his client of a range of punishment associated with a guilty plea should be considered in determining whether the petitioner received ineffective assistance of counsel.

At the post-conviction hearing, lead counsel testified that there was never an offer for less than first degree murder. He also said that he was informed by the prosecution that any plea offer would have to originate with the petitioner, and that the prosecution would have to clear any plea agreement with the victim's family. He further stated that, prior to trial, there was "some discussion" about the petitioner pleading guilty to second degree murder in exchange for a twenty-five-year sentence, but these discussions did not go anywhere.

Similarly, the district attorney general who prosecuted the case testified that there was no plea offer for any charge less than first degree murder:

> I'm certain that we discussed, at [lead counsel's] instigation, the possibility of allowing the [petitioner] to plead guilty to Second Degree Murder. An offer was never made by me, or [the assistant district attorney general], to allow [the petitioner] to plead guilty to Second Degree Murder to any sentence. The only offer was made by my office, by myself, or by [the assistant district attorney general]

was for him to enter a guilty plea to a charge of First Degree Murder. That was the only thing we would accept.

As to this claim, the post-conviction court accredited the testimony of the district attorney general and petitioner's lead trial counsel, that the only plea offer made as to the homicide charge was that he plead guilty to first degree murder, which is punishable only by death, life without parole, or life with the possibility of parole. The record supports this determination by the post-conviction court.

## **CONCLUSION**

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's denial of the petition for post-conviction relief.


_____
ALAN E. GLENN, JUDGE