IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 13, 2004

## STATE OF TENNESSEE v. TONY O. JOHNSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 00-05967     W. Fred Axley, Judge**

_____

**No. W2003-02098-CCA-R3-CD  - September 21, 2004**

_____

The appellant, Tony O. Johnson, was convicted by a jury in the Shelby County Criminal Court of second degree murder.  Following the appellant's conviction, the trial court imposed a sentence of twenty-five years incarceration in the Tennessee Department of Correction.  On appeal, the appellant challenges the sufficiency of the evidence supporting his conviction and the trial court's application of certain enhancement factors.  Upon our review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Garland Ergüden and Robert Wilson Jones, Memphis, Tennessee (on appeal); and William Yonkowski and Timothy Albers, Memphis, Tennessee (at trial), for the appellant, Tony O. Johnson.

Paul G. Summers, Attorney General and Reporter; Michael Markham, Assistant Attorney General; William L. Gibbons, District Attorney General; and Reginald Henderson and Scott Bearup, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

On November 7, 1999, Lolar Stewart was living in building 1356 of Clementine Apartments. At approximately 2:00 p.m., Stewart was sitting on the outside stairs, talking with several other residents when she saw the victim, John Cooper, standing in front of her building.  Cooper was soon joined by members of a gang known as the Gangster Disciples.  The gang members were Shakir Adams, otherwise known as "Shack";  Mario Walls, otherwise known as "Sleepy"; the appellant,

otherwise known as "Tony Creep"; and a man named Frank, otherwise known as "Hershey."[1] The gang members confronted Cooper regarding his potential involvement in the shooting of a Gangster Disciple named "Head" who had been shot the previous evening. Cooper denied any knowledge of the shooting and walked to his girlfriend's apartment in the Clementine complex.

Although some of the gang members followed Cooper; the appellant did not. Cooper entered his girlfriend's apartment and emerged holding a telephone. He dialed a number, then he passed the telephone to one of the gang members. After the call, all of the men dispersed, with Cooper heading in a direction different from the gang members. Cooper stopped when Hershey requested that Cooper come toward him. Cooper approached and stood near Hershey. Hershey asked Cooper a question, then hit Cooper. The appellant was "[a] good little distance away" from the altercation.

After the blow, Cooper stumbled and began running away. Hershey, Adams, Walls, and the appellant chased Cooper. Stewart saw Adams with a gun and heard four gunshots. At trial, Stewart testified that she did not see the appellant with a gun, but she knew he usually carried a gun. Following the first four shots, Cooper ran around the corner of one of the apartment buildings. Stewart could not discern if Cooper had been shot, but she recalled that she did not see Cooper bleeding when he turned the corner. After the gang members turned the corner in pursuit of Cooper, Stewart heard five more shots. Subsequently, Stewart went to see what had happened and discovered that Cooper had fallen two apartment buildings away from her own.

Sergeant Robert Shemwell was working with the homicide division of the Memphis Police Department on November 7, 1999, when he was instructed by his lieutenant to investigate a shooting at Clementine Apartments. Sergeant Shemwell was told that the shooting victim, Cooper, had died at Methodist South Hospital shortly after the incident.

When Sergeant Shemwell arrived at the apartment complex, other officers had already secured the area around 1386 Clementine, the area where Cooper "came to rest." During the course of his investigation, Sergeant Shemwell discovered that the perpetrators were members of the Gangster Disciples. Specifically, the appellant was implicated.

The appellant was arrested, given his Miranda rights,[2] and questioned about the incident. The appellant stated that he knew police wanted to question him about the Clementine shooting. The appellant told Sergeant Shemwell that he did not know Cooper, but Hershey, Adams, and Walls had questioned Cooper about the shooting and robbery of "Mac Head." According to the appellant, Walls hit Cooper, and Cooper ran away. Hershey told the appellant that Cooper had a gun. Adams and the appellant began firing at Cooper's back. The appellant stated that he was firing a .380 pistol, and Adams was using a 9 millimeter pistol. The appellant told Sergeant Shemwell, "I shot at him. I might have hit him. Might have not, but they said I did. I saw Shack standing over him and shoot

---

[1] The record does not reveal the full name of the individual known as Hershey.

[2] See Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

twice." As Cooper rounded the corner, the appellant's gun jammed, and he stopped to fix the gun. The appellant looked around the corner and saw Cooper on the ground, being kicked by Hershey and Walls. Then, Cooper was shot by Adams. After the incident, the appellant gave his gun to Walls for disposal.

Sergeant Shemwell stated that no gun belonging to the appellant was found at the crime scene. However, police recovered a 9 millimeter pistol belonging to Adams. Spent shell casings near the location where Cooper's body was found were determined to be from Adams' pistol. Additionally, Sergeant Shemwell noted that a live round was recovered near the location where the appellant claimed his gun jammed, lending some credence to the appellant's version of events.

Sergeant Shemwell testified that during the course of his investigation, he learned from witnesses that the incident began at 1350 or 1360 Clementine and ended at 1386 Clementine. Additionally, there was a report that Cooper "was already bleeding from the mouth and holding blood as he was running, prior to circling the end of the apartment complex and going to the outside unit where he fell." The sergeant opined that this version of events indicated that Cooper had been shot while he was running but before he rounded the corner.

At trial, Dr. O'Brien Cleary Smith testified as an expert in forensic pathology. He stated that he performed the autopsy on Cooper's body and deduced that Cooper died from multiple gunshot wounds. One of the wounds, gunshot wound A, entered the back of Cooper's left shoulder and traveled through his body, severing veins and arteries, finally exiting on the right side of Cooper's neck. Gunshot wound B entered and exited through the upper part of Cooper's left arm and could be classified as a "flesh wound." Gunshot wound C entered the front of Cooper's thigh, fracturing his femur.

Dr. Smith opined that the gunshot wounds caused internal bleeding, ultimately leading to Cooper's death. He stated that gunshot wound A, the wound to the back, was consistent with a shot fired from behind Cooper. The doctor conceded that the wound could have conceivably occurred if Cooper had been lying on his right side on the ground when he was shot. Dr. Smith stated that the wound to Cooper's thigh must have been caused by someone facing Cooper and could not have occurred from someone firing at Cooper's back.

Finally, Dr. Smith stated that the wound to Cooper's back was

> Not an instantaneously incapacitating wound, so a person could still remain active, or mobile, after receiving such a wound.
>
> . . . .
>
> It will take some time for the bleeding to begin to [a]ffect the body, the interference with breathing to the body. So it's possible for a

person to remain conscious and able to undertake voluntary action, for some period of time.

Dr. Smith asserted that Cooper would not have been able to walk or run after sustaining the wound to his thigh because the leg would no longer be capable of effectively bearing weight. Dr. Smith observed that Cooper's body showed signs that he bled from the exit wound in his neck and the blood was "expirated," meaning the blood was mixed with air as it exited the wound to Cooper's windpipe as Cooper breathed.

After examining the gunshot wounds, Dr. Smith could not definitively say if the wounds were caused by a .380 caliber bullet or a 9 millimeter bullet. The doctor explained, "The .380 and the 9 [millimeter] differ by about two thousandths of an inch in diameter. So they're both considered medium caliber weapons and they both have enough energy to produce the wounds."

The victim's mother, Cheryl Cooper-Harris, testified that she saw her son for the last time on the Thursday prior to his death. She stated that Cooper was twenty-three years old at the time of his death, and he left behind a young daughter.

Based upon the foregoing proof, the jury convicted the appellant of the lesser-included offense of second degree murder. After a sentencing hearing, the trial court imposed the maximum sentence of twenty-five years incarceration. On appeal, the appellant challenges the sufficiency of the evidence supporting his conviction and the trial court's application of certain enhancement factors.

## II. Analysis

### A. Sufficiency of the Evidence

First, we will address the sufficiency of the evidence underlying the appellant's conviction for second degree murder. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no "reasonable trier of fact" could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

Tennessee Code Annotated section 39-13-210(a)(1) (1997) defines second degree murder as the knowing killing of another. Tennessee Code Annotated section 39-11-302(b) (1997) provides:

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

In the instant case, the appellant admitted to Sergeant Shemwell that he repeatedly fired his .380 pistol at Cooper's back as Cooper was fleeing, but he did not know if any of his bullets struck Cooper. Dr. Smith stated that one of the wounds which caused the bulk of the internal damage entered Cooper's back and exited his neck. Additionally, Sergeant Shemwell stated that a witness to the offense observed Cooper bleeding as if from a gunshot wound prior to turning the corner of one of the apartment buildings. Taking this proof in the light most favorable to the State, we conclude that there was sufficient evidence to sustain the appellant's conviction for second degree murder. See State v. Adams, 45 S.W.3d 46, 55-56 (Tenn. Crim. App. 2000).

## B. Sentencing

Finally, the appellant complains regarding the trial court's application of various enhancement factors. Generally, appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d) (2003). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the defendant in his own behalf; and (7) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210 (2003); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence(s). See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169. In the instant case, the trial court inappropriately applied certain enhancement factors and did not acknowledge consideration of the sentencing principles. Accordingly, we will review the appellant's sentence purely de novo.

The appellant was found guilty of second degree murder, a Class A felony. The trial court was required to begin its sentencing determination with the presumptive sentence at the midpoint of the range. See Tenn. Code Ann. § 40-35-210(c) (2003). For a standard Range I offender, the sentencing range for a Class A felony is not less than fifteen to no more than twenty-five years. See Tenn. Code Ann. § 40-35-112(a)(1) (2003). The parties agreed that the appellant was a standard

Range I offender; accordingly, the presumptive sentence was twenty years.  Id.  The trial court was then required to increase the sentence for any enhancement factors and reduce the sentence for any mitigating factors.  See Tenn. Code Ann. § 40-35-210(d) and (e).

In the instant case, the trial court found no mitigating factors.  However, the trial court found the existence of the following enhancement factors:

> (2) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;
>
> (6) The defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense;
>
> (9) The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community;
>
> (10) The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense;
>
> (11) The defendant had no hesitation about committing a crime when the risk to human life was high;
>
> (13) During the commission of the felony, the defendant willfully inflicted bodily injury upon another person, or the actions of the defendant resulted in the death or serious bodily injury to a victim or a person other than the intended victim;
>
> (17) The crime was committed under circumstances under which the potential for bodily injury to a victim was great; and
>
> (21) The defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult.

Tenn. Code Ann. § 40-35-114(2), (6), (9)-(11), (13), (17), and (21) (2003).[3]

In the initial appellate briefs filed in the instant case, the appellant concedes, and the State agrees, that the trial court properly found the existence of enhancement factors (2), (10), and (21). Additionally, the appellant contends that the trial court erred in applying enhancement factors (6),

---

[3]  On  July 4, 2002, the statutory enhancement factors were renumbered.  See Tenn. Code Ann. § 40-35-114 (2003).

(9), (11), (13), and (17). The State concedes the trial court's error in applying enhancement factors (9), (11), (13), and (17).

Prior to our review on appeal, the United States Supreme Court released Blakely v. Washington, __ U.S. __, 124 S. Ct. 2531 (2004), which opinion impacts Tennessee's sentencing structure. Subsequent to the issuance of Blakely, the appellant moved this court to consider as an additional issue on appeal the impact of the Blakely decision upon the appellant's sentence. This court granted the appellant's request, and we further granted the State the opportunity to respond to the appellant's arguments on this issue.

This court has recently recognized that Blakely "calls into question the continuing validity of our current sentencing scheme." State v. Julius E. Smith, No. E2003-01059-CCA-R3-CD, 2004 WL 1606998, at *4 (Tenn. Crim. App. at Knoxville, July 19, 2004); see also State v. Michael Wayne Poe, No. E2003-00417-CCA-R3-CD, 2004 WL 1607002, at *9 (Tenn. Crim. App. at Knoxville, July 19, 2004). In Blakely, the Supreme Court held that

> the "statutory maximum" for Apprendi[v. New Jersey, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63 (2000)] purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority.

Blakely, __ U.S. at __, 124 S. Ct. at 2537 (citations omitted).

In its supplemental brief, the State again concedes that enhancement factors (9), (11), (13), and (17) were improperly applied "under the current sentencing scheme." Additionally, the State admits that "application of factor (6) was impermissible under the rule of Apprendi." In light of Blakely, we agree that the trial court improperly applied enhancement factors (6), (9), (11), (13), and (17). However, the State argues that "application of three of the remaining factors [(2), (10), and (21)] was proper under Apprendi and Blakely."

Clearly, the application of enhancement factor (2), which is based on the existence of a defendant's prior criminal convictions, does not violate the dictates of Blakely. Accordingly, based upon Blakely and the facts adduced in the instant case, we conclude that the trial court did not err in applying enhancement factor (2) to the appellant.

We note that, generally, the constitutionality of the application of the remaining statutory enhancement factors without supporting findings by a jury remains to be seen. See State v. Terry

Lynn Byington, No. E2003-02316-CCA-R3-CD, 2004 WL 1606993, at *4 (Tenn. Crim. App. at Knoxville, July 19, 2004). However, Blakely indicates approval of the use of enhancement factors supported by facts "*admitted by the defendant*." Blakely, __ U.S. at __, 124 S. Ct. at 2537; see also Apprendi, 530 U.S. at 490, 120 S. Ct. at 2362-63. In his Blakely argument, the appellant contends that his sentence should be reduced because the "trial court imposed sentence based upon facts not reflected in the jury verdict or admitted by the [appellant]." However, the record clearly belies this contention. As the State notes in its supplemental brief, the appellant admitted at trial and on appeal that there were facts supporting the application of enhancement factors (10) and (21). Accordingly, we conclude that there was no error in applying enhancement factors (2), (10), and (21) to the appellant. See State v. Steven M. Stinson, No. E2003-01720-CCA-R3-CD, 2004 WL 1698203, at *8 (Tenn. Crim. App. at Knoxville, July 29, 2004); State v. Antonio Fuller, No. M2002-02377-CCA-R3-CD, 2004 WL 1562546, at *14 n.2 (Tenn. Crim. App. at Nashville, July 13, 2004), application for perm. to appeal filed, (Sept. 2, 2004).

Regardless, given the appellant's extensive criminal history, we conclude that if the application of enhancement factors (10) and (21) were error, the application of enhancement factor (2) alone was entitled to sufficient weight to warrant the imposition of the maximum sentence of twenty-five years. See State v. Boggs, 932 S.W.2d 467, 475-76 (Tenn. Crim. App. 1996) (stating that determining the correct length of sentence is not the result of a mathematical formula; rather, it is left to the discretion of the court to assign the appropriate weight to existing factors). In other words, if the application of enhancement factors (10) and (21) were error, the error was harmless. See Stinson, No. E2003-01720-CCA-R3-CD, 2004 WL 1698203, at *8.

### III. Conclusion

Finding no reversible error, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-8-