IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 28, 2009

## STATE OF TENNESSEE v. XAVIER TYRONE NOLAN

**Appeal from the Criminal Court for Knox County**
**No. 88669     Richard R. Baumgartner, Judge**

_____

**No. E2008-02762-CCA-R3-CD - Filed December 28, 2009**

_____

The Defendant, Xavier Tyrone Nolan, was convicted by a Knox County Criminal Court jury of attempted voluntary manslaughter, a Class D felony, and aggravated assault, a Class C felony. The trial court merged the attempted voluntary manslaughter conviction into the aggravated assault conviction and sentenced the Defendant to a Range I sentence of five years in the Department of Correction. On appeal, he argues that the trial court improperly enhanced his sentence. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee (on appeal), and Adam Elrod, Knoxville, Tennessee (at trial), for the appellant, Xavier Tyrone Nolan.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Ta Kisha Monette Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The case arises out of the July 14, 2007, shooting of the victim, Leslie Renard Benson, also known as Scott LaRoc, at the Walter P. Taylor housing development in Knoxville, Tennessee, for which the Defendant was indicted on one count of attempted first degree murder, two counts of attempted especially aggravated robbery, and two counts of aggravated assault.

**Trial**

Knoxville Police Officer Mark Eslinger testified that he responded to a shooting call at a store on July 14, 2007. Officer Eslinger testified that when he arrived at the scene, he observed the victim, who had been shot, leaning against the counter inside the store. Officer Eslinger stated that he spoke with the victim, who was conscious but not able to communicate very well, and ensured that backup and emergency personnel were en route. Officer Eslinger testified that he searched the area for shell casings but did not find any. Officer Eslinger identified a photograph of the crime scene showing the victim's motorcycle parked outside the doorway of the store. Officer Eslinger acknowledged that no mention of a robbery was in his first responder report and that the victim's area of injury was noted only as "the right side."

Lena Maynard, a nurse at the University of Tennessee Hospital, testified that she was the primary nurse who cared for the victim from the time he arrived at the hospital until he went into surgery. Maynard testified that her report noted that the victim had suffered a gunshot wound to the back. Looking at a photograph of the victim's injury, Maynard described the gunshot wound as being "in the flank area," but she acknowledged that other hospital personnel could have termed the location differently. She said that when the victim arrived, he was "oriented to person, place, and time, and he was interactive."

Danielle Davis testified that she was at the store with her fiancé, Emanuel Moore, on July 14, 2007. Davis stated that Moore left to run an errand, while she stayed at the store with the clerk. Davis said that when she started to go outside to clear away loiterers in response to a customer complaint, she heard a gunshot. She stated that she ran to the back of the store, at which point she questioned whether the sound had been a gunshot or a firecracker. She said that when she went toward the front of the store, the victim walked inside slumped over, saying he had been shot and holding his stomach. (II: 69-71)

Ms. Davis testified that Moore walked into the store behind the victim and locked the door. She recalled that the victim dialed 9-1-1 and handed the phone to Moore, who reported the incident. Davis said she knew the Defendant and Victor Harrison and did not recall seeing them outside the store. She said she knew the shooting occurred outside the store.

Emanuel Moore testified that he was an employee of the Walter P. Taylor Market & Deli on July 14, 2007. He said he was getting out of his car "[a] couple of feet" from the front of the store when he heard a gunshot or a firecracker and saw the victim run "slumped over" into the store. Moore stated that twenty or thirty people were standing around outside and everyone scattered at the sound of gunfire. Moore said that he followed the victim into the store and locked the door. Moore recalled that the victim told him that he had been shot and called 9-1-1 but that Moore spoke with the dispatcher. Moore acknowledged he told the 9-1-1 dispatcher that the victim had been shot in the stomach, and the victim did not correct him.

The forty-three-year-old victim testified that he lived in the Defendant's mother's house when he first moved to Knoxville in 1998. He said he had never had any problems with the Defendant. The victim recalled that on July 14, 2007, he attended hair design school from 9:00 a.m. to 5:30 p.m. and then had dinner at Applebee's in East Towne Mall with some of his fellow students. He said that afterward, he rode his motorcycle to the Walter P. Taylor Market & Deli to purchase a Black & Mild cigar.

The victim testified that a crowd of thirty to fifty people was standing around outside the store and that he parked his motorcycle on the sidewalk. He said he went inside the store and bought a cigar. He said that when outside the store, the Defendant approached him and said, "Scott, can I holler at you for a minute?" The victim said that he was not concerned at this point because he and the Defendant always spoke whenever they saw one another and that the victim was dating the Defendant's aunt, Lajuan Nolan. The victim recalled the Defendant said he had heard that the victim had told people the Defendant and his cousins had committed a robbery. The victim said that he denied having told anyone that.

The victim testified that the Defendant told him that he did not need to talk about the Defendant and that the victim told the Defendant that he had no reason to talk about the Defendant. The victim said that the next thing he knew, the Defendant pulled out a gun and pointed it at him. The victim recalled that he asked the Defendant why he had a gun and that the Defendant said, "[Y]ou ready to set that out?" The victim said this meant "[g]ive [me] your money." The victim stated that with his palms facing forward for the Defendant to see, he told the Defendant that he would not give him money and that the Defendant would have to shoot him. The victim testified that he had $2,189 in his pocket for his school tuition and that he was not going to give it to anyone even if he had to die.

The victim testified that because he did not believe the Defendant would shoot him, he turned around and walked off. However, the victim observed that the crowd of people outside "looked cruel" and were "dressed in red all the time," so he thought it would be safer to return to the store rather than drive away on his motorcycle and be a "moving target." The victim testified that as he reached for the store door, he heard one of the Defendant's friends say that the Defendant should shoot the victim. He said that the next thing he knew, he had been shot and "was grabbing [his] stomach because, evidently, the . . . bullet landed in [his] stomach, and it was burning."

The victim testified that he made it inside the store, someone locked the door, and he called 9-1-1 on his cell phone. He said that because he started "gurgling," he handed the phone to Moore. The victim recalled that EMS arrived and that he was taken to the hospital where he underwent surgery. He stated that his injuries were caused by a gunshot wound to the back and will affect him for life. The victim stated that he had seen the Defendant in the community since the incident and that the Defendant had "throw[n] little gestures," indicating that he still had a problem with the victim.

The victim acknowledged that he had prior convictions for theft and evading arrest. He said that he had been on Community Alternatives to Prison Program (CAPP) since 2003 but had been released to state probation. He said that in 2005, he pled guilty to possession with intent to sell, which stemmed from a charge in the late 1990s. The victim denied carrying a gun the day of the incident but admitted possessing a gun in the past.

Beth Goodman, a forensic evidence technician with the Knoxville Police Department, testified that she responded to the scene. She stated that she photographed the scene, collected evidence, and went to the hospital to photograph the victim.

Daniel Crenshaw, a forensic evidence technician with the Knoxville Police Department, testified that he responded to the University of Tennessee Hospital on the night of the incident to retrieve the bullet that was extracted from the victim's body. Crenshaw said that the bullet was small and appeared to be .22 or .25 caliber.

Knoxville Police Officer Andrew Gyorfi testified that on August 6, 2007, he responded to Fort Sanders Regional Medical Center where the Defendant was being treated for a gunshot wound to his hand. Officer Gyorfi said that when he began his investigation into the Defendant's injury, he discovered that the Defendant had several outstanding juvenile petitions for his arrest and took him into custody. The State rested.

The defense called Victor Harris, also known as "Lil Vic," who testified that he was at the Walter P. Taylor housing development with the Defendant and one of the Defendant's friends, Justin Jackson, also known as "Little Bonter," on July 14, 2007. Harris said that he had been good friends with the Defendant for many years but did not regularly socialize with Jackson. Harris stated that on the night in question, he saw the Defendant and the victim having a quiet conversation outside the store, but then the victim started arguing and acting like he wanted to fight the Defendant. Harris said that he tried to get the Defendant to accompany him into the store but that the Defendant remained outside. Harris recalled that after he entered the store, he thought that he heard fireworks but that everyone said it was a gunshot. Harris said he saw the victim bleeding and holding his stomach as he tried to enter the store.

Harris testified that the victim did not go into the store before the incident. Harris denied being in a gang called the Rollin 20s or the Bloods. Harris also denied that the background color on his MySpace page was red or that it showed an individual wearing a red rag over his face.

Lajuan Nolan, the Defendant's aunt, testified that she and the victim had been engaged for two years but were no longer dating. She said that the victim had a reputation of being "short-tempered and [a] bully." She stated that he was also known to be a gun-carrying drug dealer. Nolan testified that when she left the courthouse the previous day, the victim approached her, called her "a black bitch," and threatened her. She said that she had an escort take her to her car. She stated that the morning of the day she testified, her car tire was flat which delayed her in getting to court. With

-4-

regard to the Defendant, Nolan admitted that he was known to "hang around with the thug boys" in the community and had a reputation for carrying a gun.

The Defendant testified that he was sixteen years old at the time of the incident. He said that he knew the victim well through his family and was on a friendly basis with him even though they did not spend much time together. The Defendant stated that he previously had seen the victim with a gun and that the victim was "a known gun carrier."

The Defendant testified that on the day of the incident, he was visiting his grandmother in the housing development and then met his friends, Harris and Jackson. He said that he and his friends were hanging out in the parking lot behind the store when a "chronic," or drug user, asked if he wanted to purchase a gun. The Defendant stated that he purchased the gun for $10, thinking he could later sell it for a profit. He said that the gun was loaded with six bullets but that he was unable to sell it because it was small.

The Defendant testified that later that day, he saw the victim riding his motorcycle toward the store and went to talk to him about a rumor he had heard the victim was spreading. The Defendant recalled that he said, "Scott, can I holler at you?" and that the victim asked him to wait while he went inside the store. The Defendant testified that when the victim came outside, the victim asked him, "What's up?" The Defendant said that he asked the victim about a rumor the victim was spreading that the Defendant had robbed someone of money and drugs.

The Defendant testified that the victim started to insult the Defendant and his family and then came toward him. The Defendant said that the victim put his hand under his shirt, and he thought the victim was reaching for a gun, so he pulled out his gun, turned his head, and shot the victim once. The Defendant said that the victim was facing him when he pulled out his gun. The Defendant stated that the victim held his stomach and walked back into the store. He said that he was so shocked that he took off running and was "on the run" for twenty-two days. The Defendant stated that he was arrested when he went to the hospital for treatment after accidentally shooting his finger while "messing with" a friend's gold gun.

The Defendant denied that he was a member of the Bloods or Rollin 20s gang. The Defendant stated that members of the Bloods wore red, and members of the Crips, a rival gang, wore blue. The Defendant recognized the words to a specific gang song. The Defendant admitted that he put the words to that gang song on one of his MySpace pages but said he did so because he liked that part of the song, not because he was a gang member. The Defendant denied that the background was red on his MySpace page but admitted that it had a "B" on it. When shown his page, the Defendant acknowledged that the background was red and black and a crown over the "B." The Defendant admitted that his page was last logged into eleven days before the incident.

The Defendant initially acknowledged that he may have opened a new MySpace page in January 2008 but then denied that he created it. He said that his nickname is "Lil Zay" and admitted that the page identified "Lil Zay" as a Rollin 20. He also admitted that the page contained a

photograph of him wearing red shoes and red pants with a red flag hanging out of his back pocket and standing on top of a blue flag.

The victim testified in rebuttal that he did not threaten the Defendant or put his hand under his shirt as if he had a gun. He said that the Defendant shot him in the back as he was getting ready to step into the store. He stated that he did not sell drugs in order to get the $2,100 he had with him that night, nor was he carrying a gun at that time. He denied that he had ever carried a gun and said he had not sold drugs since 1998. He said he did not see Victor Harris the day of the incident.

Patricia Resig, a firearms examiner with the Knoxville Police Department, testified about the expected gunshot residue burns and stippling at various distances. She stated that she was not involved in this case.

Officer Bernhard Braeuner with the Knoxville Police Department testified that he had been assigned to the gang task force until recently. He explained that the Bloods is a street gang that started in Los Angeles, California but that there are spontaneous groups, without a hierarchy, across the county fashioning themselves after the Los Angeles Bloods. He further explained that the Rollin 20s originated from Los Angeles Bloods symbolism where the gang would take over multiple street blocks. Thus, the Rollin 20s would "roll" from 20th Street to 29th Street. He said that the Bloods generally used the color red, and the Crips, a rival gang, generally used the color blue. He also explained that the Bloods, who fall under the "people nation" of street gangs, used a five-point crown in its symbolism and that the Crips, part of the "folk nation," used a six-point crown. After viewing the MySpace page created in January 2008, Officer Braeuner stated that the page, in its entirety, included Bloods symbolism.

The jury found the Defendant guilty of the lesser-included offense of attempted voluntary manslaughter in count one, not guilty of attempted especially aggravated robbery in counts two and three, and guilty of aggravated assault in count five.[1]

## Sentencing Hearing

Officer Braeuner testified that since the trial, he had reviewed the Defendant's file, which included correspondence to and from the Defendant while in custody. Officer Braeuner said that the Defendant had written letters, containing Bloods terminology and symbolism, to a number of confirmed gang members and had also received correspondence containing similar signs and terminology. Officer Braeuner concluded that the Defendant's correspondence indicated that he affiliated himself with the Bloods. Officer Braeuner acknowledged that aside from the Defendant's correspondence and MySpace accounts, he had no personal knowledge of any criminal investigations involving the Defendant that were related to gang activity. The trial court merged the attempted voluntary manslaughter conviction into the aggravated assault conviction and sentenced the Defendant to five years as a Range I offender in the Department of Correction.

---

[1]The record reflects that aggravated assault charged in count four was dismissed before trial.

**ANALYSIS**

On appeal, the Defendant challenges the trial court's enhancement of his sentence from three to five years. Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d) (2006). This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). As the Sentencing Commission Comments to Tennessee Code Annotated section 40-35-401(d) note, the burden on appeal is on the defendant to show that the sentence is improper.

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence.

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994); see T.C.A. § 40-35-210(e) (2006).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his or her own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210 (2006); see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229 (Tenn. 1986).

In imposing a specific sentence within the appropriate range of punishment for the defendant:

> [T]he court shall consider, but is not bound by, the following advisory sentencing guidelines:
>
> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the

-7-

relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c). The weighing of the various mitigating and enhancement factors is "left to the trial court's sound discretion." State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008).

The sentencing range for aggravated assault, a Class C felony, is not less than three nor more than six years. T.C.A. § 40-35-112(a)(3) (2006). In sentencing the Defendant, the trial court first stated that it was not going to enhance the Defendant's sentence based on his juvenile record, although it noted that the Defendant had an extensive juvenile record. The court found that the Defendant exhibited additional criminal behavior in addition to that necessary to establish his range. Specifically, the Defendant's conduct since he had been in custody indicated that he was affiliated with a gang and planned to continue that lifestyle. See T.C.A. § 40-35-114(1). The court also noted that the Defendant used a deadly weapon, which was not the basis for conviction, and that the victim suffered extensive serious bodily injury more than necessary to establish the offense. See T.C.A. § 40-35-114(6), (9). The court arrived at a sentence of five years.

We conclude that our review is de novo without a presumption of correctness because the trial court incorrectly applied enhancement factor (1), finding that the Defendant had a "previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range." The trial court noted the Defendant had a record of juvenile adjudications but stated it would not consider those adjudications for enhancement of the sentence. The court later stated that it would consider the Defendant's affiliation with a street gang, which "indicates his intent to continue that affiliation and continue that lifestyle." Although there was proof at trial and the sentencing hearing concerning the defendant's correspondence while in jail and his MySpace page reflected that the defendant affiliated himself with the Bloods street gang, and the trial court also observed the defendant flashing gang signs as he was leaving the courtroom following one of his earlier bond hearings, there is no proof of the Defendant's being involved in any criminal activity by virtue of his association with a street gang. Although the presentence report reflects that the defendant admitted to smoking marijuana weekly since the age of fourteen, the Defendant was a juvenile during the time period he acknowledged marijuana use. This court has said that offenses committed as a juvenile may be considered only under then-factor (20), now (16), which permits enhancement for offenses committed by a juvenile that would be felonies if committed by an adult. See State v. Adams, 45 S.W.3d 46, 58 (Tenn. Crim. App. 2000). The State offered no proof that the Defendant's drug use was felonious, and we cannot consider this evidence to enhance the Defendant's sentence.

In addition, the trial court erred in enhancing the Defendant's aggravated assault sentence based on the seriousness of the injuries inflicted on the victim. See T.C.A. § 40-35-114(6). Our

supreme court has concluded that "proof of serious bodily injury will always constitute proof of particularly great injury." State v. Jones, 883 S.W.2d 597, 602 (Tenn. 1994). Thus, our courts have held that application of the "particularly great injury" enhancement factor is not appropriate in cases where serious bodily injury was an element of the offense. See, e.g., Jones, 883 S.W.2d at 602 (aggravated assault); State v. Nix, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995) (especially aggravated robbery); State v. Williamson, 919 S.W.2d 69, 82 (Tenn. Crim. App. 1995) (vehicular assault). Therefore, because "serious bodily injury" was an element of aggravated assault as charged in the present case, the trial court erred in applying the "particularly great" injury enhancement factor to the sentence.

**Factor (8)**

Upon de novo review, we note that the presentence report reflects that the Defendant violated probation in juvenile court on at least five occasions. As noted by our supreme court in State v. Jackson, 60 S.W.3d 738 (Tenn. 2001):

> [W]e hold today that section 40-35-114[(16)] is not the exclusive means for using juvenile court records to enhance sentences in subsequent adult criminal proceedings. Because probation violations are not "delinquent acts" as that term is defined by our legislature, factor [(16)] does not prevent these violations from being considered under other enhancement factors. . . . Moreover, because measures less restrictive than confinement have failed, the application of [section 40-35-114(8)] is also proper.

Id. at 743-44 (footnote omitted). Therefore, the Defendant's sentence is enhanced based on his prior violations of probation in juvenile court. See T.C.A. § 40-35-114(8).

**Factor (9)**

The Defendant's sentence was also subject to enhancement based on his use of a deadly weapon during the commission of the offenses. See T.C.A. § 40-35-114(9). Under our Sentencing Act, enhancement factors to be applied are those that are "appropriate for the offense" and which are "not themselves elements of the offense as charged in the indictment." T.C.A. § 40-35-114. Thus, "[f]acts which establish the elements of the offense charged may not also be the basis of an enhancement factor increasing punishment." Jones, 883 S.W.2d at 601. Here, the charge of aggravated assault presented to the jury was aggravated assault by virtue of causing serious bodily injury. Therefore, the Defendant's sentences are subject to enhancement for his use of a deadly weapon. See State v. Carter, 986 S.W.2d 596, 598 (Tenn. Crim. App. 1998).

Upon de novo consideration of the applicable factors, we hold that the trial court did not err in imposing a five-year sentence for the Defendant's conviction. That the Defendant used a deadly

weapon and had previously and repeatedly violated terms of probation weigh heavily in favor of enhancement to five years.

## CONCLUSION

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE